[No. 30506.   Department One.   January 8, 1949.]

JOEL W. BAKER *et al., Appellants,* v. MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, *Respondent.*[1]

[1]Reported in 201 P. (2d) 893.

*Emory, Howe, Davis & Riese,* for appellants.

*Evans, McLaren, Lane, Powell & Beeks* and *Louis W. Dawson,* for respondent.

HILL, J.—On August 23, 1944, the respondent delivered a ten-thousand-dollar policy upon the life of Dr. John M. Blackford to the appellants, who are named as the beneficiaries therein and who paid the premiums thereon. Dr. Blackford died September 12, 1945. Respondent refused payment, and appellants commenced an action upon the policy. Trial resulted in a verdict for the appellants in the sum of ten thousand dollars. The trial court granted a

motion for judgment n.o.v. and entered a judgment of dismissal. The trial court also granted an alternative motion for a new trial

". . . not to become effective unless and until the order granting a motion for judgment notwithstanding the verdict is hereafter reversed."

The trial court concluded that there was no evidence to support the verdict against any one of three defenses, *i.e*: (1) The insured was not in good health at the time the policy was delivered (this defense being based upon a provision in the policy reading, "The policy shall not take effect unless and until the policy is delivered to the insured and the first premium is paid during the insured's good health"); (2) the insured made untruthful answers to questions material to the risk, with intent to deceive the insurance company; and (3) the beneficiaries, who paid all the premiums, were chargeable with knowledge of the falsity of those answers.

We prefer to discuss separately the third defense referred to, because we do not believe that, as stated, it constitutes a defense. There is no question that either of the first two defenses, if established, would enable the insurance company to avoid payment on the policy.

We can readily see how a judge or a jury could reach a conclusion adverse to the appellants on either or both of those defenses. But the fact is that the case went to the jury under instructions which presented the issues raised thereby, and the jury must have determined that neither of those defenses had been established. We are confronted, therefore, so far as the judgment n.o.v. is concerned, with the issue of whether there was sufficient evidence to carry the case to the jury on the issues raised by those defenses.

We are, of course, bound to consider the evidence and the inferences therefrom from the standpoint most favorable to the appellants. *Mathers v. Stephens,* 22 Wn. (2d) 364, 156 P. (2d) 227; *Geri v. Bender,* 25 Wn. (2d) 50, 168 P. (2d) 144.

The jury was presented with two questions:

(1) Was Dr. Blackford in good health when the policy was delivered? "Good health," as used in a pro-

vision of the policy requiring the insured to be in good health, was accurately defined by the trial court as follows:

"You are instructed that the term 'good health' does not mean perfect health. The fact that one may have some trivial or temporary ailment does not necessarily mean that he is not in good health. It does not mean absolute perfection, but is a comparative term and does not require an applicant for insurance to be entirely free from all ills and infirmities.

"Good health has also been defined as 'a state of health free from any disease or ailment that affects seriously the general soundness and healthfulness of the system, and not merely such temporary disturbances or disorders as yield readily to treatment and do not tend to weaken or undermine the constitution.' Good health means 'an absence of any disease that has a direct tendency to shorten life.' "

See 18 Words and Phrases (Perm. ed.) 501 *et seq.*, together with the pocket supplement thereto, p. 90 *et seq.* (1948); and *Pickens v. Security Benefit Ass'n*, 117 Kan. 475, 231 Pac. 1016, 40 A. L. R. 654. See, also, the annotation in 100 A. L. R. 362.

After defining "good health," the trial court told the jury:

"If, therefore, you believe by a fair preponderance of the evidence that at the time said policy of insurance was delivered Dr. Blackford did have a disease or ailment having a direct tendency to shorten life, then this policy never came into effect and you should return a verdict in favor of the defendant. . . .

"If you find from the evidence that on August 23, 1944, Dr. Blackford had fully recovered from any previous illnesses or ailments which he may have had and was not at that time suffering from any serious ailment or condition of health which would tend to shorten the period of his life, then I instruct you that Dr Blackford was, at that time, in 'good health' as that term is used in the insurance policy of the defendant company."

The jury might well have believed those experts who concluded, from an examination of the records of the Mason clinic and the Virginia Mason hospital (particularly those covering the hospitalizations of Dr. Blackford in 1940, 1942, 1943, and his last illness in 1945) and the autopsy report, that Dr. Blackford died of bronchial asthma; that the hos-

pitalizations in 1940, 1942, and 1943 had been for the same disease; and that the autopsy findings indicated that he must have had bronchial asthma for "two, three or four years" before his death. This testimony, if believed, would have established that he was not in good health on August 23, 1944, when the policy was delivered.

█ But the appellants, who examined the same clinic and hospital records, reached the conclusion that the records disclosed nothing more serious than acute bronchitis as far as the hospitalizations of 1940, 1942, and 1943 were concerned, and that Dr. Blackford's death was attributable to pneumonia; that he had recovered from each attack of acute bronchitis; and that acute bronchitis does not impair the health or affect longevity. Included among the appellants so testifying were Dr. Blackford's attending physicians in his last illness, doctors who had attended him during other hospitalizations, and doctors who were in daily contact with him. The jury elected to believe the appellants and found by its verdict that Dr. Blackford was in good health, as that term is used in the insurance policy, at the time of the delivery thereof. We cannot agree with the trial court that there was no credible evidence to sustain the verdict on that issue.

(2) Did Dr. Blackford, with intent to deceive the insurance company, make untruthful answers to questions which were material to the risk assumed? The respondent insists that the doctor's answers to six questions were false, and that those answers were made with intent to deceive. The questions at issue will be considered *seriatim,* with a brief statement showing the extent to which the answers were either incomplete or false:

*Question 1.* "State every illness, disease, injury and operation you have had since childhood. . . . [Answer: ]

| Name of Illness, etc. | Attacks No. | Attacks Date | Duration | Complications and After Effects | Date of Complete Recovery |
|---|---|---|---|---|---|
| Appendectomy | 1 | 1917 | 2 wks. | None | 1917 |
| Tonsillectomy | 1 | 1912 | 1 day | None | 1912 |
| Influenza | 2 | 1918-1941 | 2 wks. | None | 1918-1941" |

Records of the three hospitalizations of Dr. Blackford next preceding his last illness show "Diagnosis on discharge" in each instance to have been: 1940, "*Asthma* Bronchitis, acute" ("Asthma" crossed out); 1942, "Extrinsic Asthma"; and 1943, "Bronchial Asthma, Chronic Bronchitis."

The respondent's experts testified that examination of the clinic and hospital reports covering those hospitalizations established that Dr. Blackford actually had bronchial asthma on each occasion. It is apparent that even if it was acute bronchitis, as contended by the appellants, there was no disclosure thereof.

*Question 2.* "State every physician or practitioner whom you have consulted for any purpose in the last 5 years. . . . [Answer:]

| Name of Physician or Practitioner | Address | Date | Name of Illness, etc. (include Health Examinations) |
|---|---|---|---|
| Dr. R. King | Seattle, Wn. | 1941 | Influenza" |

The records covering the 1940, 1942, and 1943 hospitalizations heretofore referred to, show that Dr. King was the attending physician in 1940 and 1942, and that Drs. Capaccio, Tolan, and G. Dowling were the attending physicians in 1943. (Dr. Capaccio testified that the hospital records were in error in including his name.) In any event, it is clear that Dr. King was not the attending physician in 1943, as he was then in the military service.

*Question 3.* "Have you ever had an X-ray, electrocardiogram, blood test or other special laboratory test? [Answer:] Yes. . . . X-Ray chest plus electrocardiogram 1941—normal."

The records disclose that X rays had been taken in 1934 and 1935 and in connection with the 1940 and 1942 hospitalizations; electrocardiograms were taken in 1934, 1935, 1940, 1942, and 1943; blood tests of various kinds were made in 1934 and in connection with each of the three hospitalizations referred to; sputum tests were made in connection with the 1940 and 1942 hospitalizations; and there were also allergy tests made.

*Question 4.* "Have you ever been in a hospital, clinic, sanitarium or institution for observation or treatment or

other medical purpose? [Answer:] Yes. . . . Only as above."

"Only as above" must have referred to the appendectomy, tonsillectomy and influenza, as per the answer to question No. 1. The record shows that Dr. Blackford was in the Virginia Mason hospital eight different times for a total of forty days: three times in 1934, once in 1935, twice in 1940, once in 1942, and once in 1943, the last being approximately fifteen months prior to the date of making the application for insurance. The respondent insists that the record of the three most recent hospitalizations prior to the making of the application

". . . show the illnesses were exceedingly serious as disclosed by the treatments ordered and given, the nurses' reports (they being on service twenty-four hours per day), and the symptoms described."

*Question 5.* "Is your health impaired or are you in any way deformed or crippled? [Answer:] No."

This question and answer is really covered by what we have said with reference to the first defense discussed herein, *i.e.,* that Dr. Blackford was not in good health when the policy was delivered. If that was a question of fact for the jury, and we have held that it was, the jury's finding that he was in good health when the policy was issued constituted a determination that there was no falsity in the doctor's answer that his health was not impaired.

*Question 6.* "HAVE YOU GIVEN COMPLETE ANSWERS TO ALL THE ABOVE QUESTIONS? [Answer:] Yes."

This question and answer will not be discussed in detail. It is obvious that the answers were not complete.

The appellants explain what to a layman appear to be glaring omissions in the answers to the first four questions, by testimony that

(a) ". . . he had occasional winter colds. Whenever he did, we put him in the hospital because he was that valuable to us. He could direct from his bed, a lot in consultations with the younger men, and it was a means of protecting him and getting him well quicker and back on

the job; during the war we did all of our staff that way of necessity";

and

". . . we always tried to hospitalize our own doctors on slight provocation in order to—to get them back on the job as quickly as we could, because their time was worth money to the organization."

(No explanation is made of why this practice did not apply to Dr. Capaccio, who, testifying that the inclusion of his name on Dr. Blackford's hospitalization record in 1943 was an error, said:

"I did not see Dr. Blackford because I was ill, myself, at the time. We had both returned from a medical meeting, and both had gotten colds. And I stayed home and nursed mine through, so I did not see Dr. Blackford.")

(b) In further testimony by the appellants, it was stated that the hospitalizations in 1940, 1942, and 1943 were for acute bronchitis, that Dr. Blackford had completely recovered therefrom, and that it did not in any way impair his health or affect his longevity. (The inference to be drawn was that they were of such slight consequence as not to be worth mentioning, except by a reference to influenza in 1941, which might refer to either the 1940 or the 1942 hospitalization. The further thought occurs to us that, since the doctor did not pay for these hospitalizations, there was lacking in this case one reason why hospitalizations make an indelible impression on a layman.)

(c) They also testified that the various X rays, electrocardiograms, blood tests, and sputum tests disclosed nothing organically wrong; that some of them were merely routine, and, as a matter of fact, not all of them would have been taken

". . . if there had been some question about the patient's difficulty in paying for such an examination. But here was a doctor we wanted to know all about him. It didn't cost us anything there in the hospital to make this examination, and it was made, and there was nothing pertinent showed in any of these tests that were made at that time."

(The inference to be gathered from this testimony is that, to use the barbershop vernacular, they merely "gave the customer the works.")

If the jury accepted the appellants' diagnosis of Dr. Blackford's ailment and their explanation of the hospital records, the X rays, etc., it could very logically conclude that there was no intent to deceive, because Dr. Blackford would have regarded all of these matters as of no consequence, especially when it is conceded that he was a vigorous, robust man who worked long hours, seven days a week.

In 1944, when Dr. Blackford made his application, there was in effect a statute (Rem. Rev. Stat., § 7078 [P.P.C. § 645-11] which provided that no misrepresentation or warranty made in the negotiation of a contract or policy of insurance by the insured, or in his behalf, should be deemed material or defeat or avoid the policy, or prevent its attaching, unless such misrepresentation or warranty was made with intent to deceive. A detailed statement of the principles of law applicable to a consideration of the matter of falsity of representations, and of intent to deceive, within the purview of that statute, has recently been made in *Kay v. Occidental Life Ins. Co.*, 28 Wn. (2d) 300, 183 P. (2d) 181, and nothing is to be gained by a restatement of them here.

The trial court having instructed the jury in accordance with the principles of law therein laid down, and the jury by its verdict having found that there was no intent to deceive the insurance company in the statements and omissions by Dr. Blackford in answering the questions herein discussed, we cannot agree with the trial court that there was no credible evidence to sustain the verdict on that issue.

The third contention made by the respondent and adopted by the trial court in granting its motion for a judgment n.o.v. is that the appellants, the beneficiaries under the policy, who had paid the premiums thereon, were chargeable with knowledge of the falsity of Dr. Blackford's answers and consequently could not recover thereon. This defense, or contention, is based upon the fact that the appel-

lants joined in the application, as shown by the following excerpt therefrom:

"This application is made at the request of the undersigned who intends to pay all premiums and who ratifies the statements and answers contained in such application and in the statements to Medical Examiner.

"The Mason Clinic
by George D Capaccio [signed]"

■ Dr. Capaccio signed the application on behalf of the appellants on July 21, 1944. Dr. Blackford had not then made the answers the truthfulness of which are so strenuously attacked, and did not make them until July 28, 1944. The application containing those answers was, however, made a part of the policy which was delivered to and remained in the possession of the appellants. We can agree with the respondent that, the policy being in the appellants' possession, they were charged with knowledge of the falsity of the statements contained therein, if they were false; we do not agree with the respondent and the trial court if it be their position that a policy of insurance may be avoided where it does not appear that such statements were intended to deceive the insurance company.

We say "if it be their position" because we are not sure that the omission of intent to deceive from the third ground given for granting the judgment n.o.v. was not inadvertent. In instruction No. 10, the trial court apparently recognized that such an intent is necessary by beginning:

"With respect to the intent of Dr. Blackford and The Mason Clinic to deceive the insurance company, you are also entitled to consider . . . the closeness or remoteness of the time of disease or afflictions . . . and the absence or continuation of symptoms thereof, *as affecting the presence or absence of an actual intent to deceive.*" (Italics ours.)

We shall for the moment, however, assume that the position of the respondent and the trial court is that mere knowledge of the falsity of Dr. Blackford's answers by the beneficiaries who ratified them barred recovery on the policy by the beneficiaries.

█ Attention is again directed to our then-existing statute, Rem. Rev. Stat., § 7078, which provided that no misrepresentations by the insured *or in his behalf* should defeat or avoid a policy unless made with intent to deceive. It seems to us that ratification by a beneficiary of statements and answers by an insured which constitute misrepresentations amounts to no more than a misrepresentation *in his behalf,* and that, by the express terms of the statute, it does not defeat or avoid the policy, unless done with intent to deceive. But, if not within the statute, it is within the rule laid down by the supreme court of Arkansas in *Wilbon v. Washington Fidelity Nat. Ins. Co.*, 182 Ark. 57, 29 S. W. (2d) 680, where the beneficiary was required to certify that the answers made to the questions in the application were complete and true in every particular. The court there said:

"He was bound by such statements and representations to the same extent only, if they proved to be false, as if he had made such representations upon an application for insurance upon his own life wrongfully and with an intent to deceive and not otherwise."

We can conceive of a situation in which beneficiaries who were paying the premiums might have knowledge of the insured's physical condition that the insured himself did not have, so that, in ratifying the insured's answers, they might have a fraudulent intent even though the insured had no intention to deceive, either because he did not know that the answer was false or because he had no realization that the undisclosed matter, which seemed of no significance to him, was really material and important. The policy or payment thereunder could in such a case, it seems to us, be avoided because of the fraudulent intent of the beneficiaries, even though there was no intent to deceive on the part of the insured. See *Gamble v. Metropolitan Life Ins. Co.*, 92 S. C. 451, 75 S. E. 788, 41 L. R. A. (N.S.) 1199.

█ Our conclusion is that, while insurance policies may be avoided because beneficiaries have, with knowledge of their falsity, ratified answers or statements of the insured,

there must be present in such a case an intent to deceive the insurance company. There is not one standard of accountability for insureds as to their answers and statements and another for beneficiaries who ratify those answers and statements.

With the element of intent to deceive added to the third defense or ground for judgment n.o.v., it is apparent that the same evidence which we have held was sufficient to take the issue of Dr. Blackford's intent to deceive to the jury, was likewise sufficient to take the similar intent of the beneficiaries to the jury; and, as previously indicated, we cannot agree with the trial court that there was no credible evidence to sustain the verdict on that issue. Since we hold that the verdict of the jury should not have been set aside for any of the reasons assigned by the trial court or the respondent, the order granting a judgment n.o.v. will be reversed.

We then come to a consideration of the trial court's action in granting a motion for a new trial, to become effective in the event of a reversal of the order granting a judgment n.o.v.

It is urged by the appellants that the order granting a new trial is based upon the same three reasons as the order granting a judgment n.o.v. With that contention we cannot agree. Appellants urged upon the trial court

". . . that if an order is made in the alternative granting a new trial that it should contain some express reasons or grounds to obviate that possibility of re-trial in the event there should be a reversal."

This the trial court specifically and definitely declined to do, saying:

"The record may show that without assigning any particular reason—which the Court isn't required to do in granting of a Motion for New Trial—that in the event I am in error in granting the Motion for Judgment N.O.V., then the Motion for a New Trial will be granted."

The form of the order actually entered sets forth that the court has determined that there was no evidence to support

the verdict against any of the three defenses set out in the second paragraph of this opinion, and then reads as follows:

"Now, THEREFORE, by reason of the premises,

"IT IS HEREBY ORDERED that the motion of the defendant for a judgment in its favor notwithstanding the verdict of the jury, be and the same is hereby granted.

"IT IS FURTHER ORDERED that the defendant's alternative motion for new trial be and the same is hereby granted, said ruling granting a new trial not to become effective unless and until the order granting a motion for judgment notwithstanding the verdict is hereafter reversed, vacated or set aside in a manner provided by law."

We are aware that what is determinative as to whether a reason or reasons have been assigned for the granting of a new trial is not what the trial judge has said in an oral opinion or in a colloquy with counsel, but rather what the court says in its written order. We are convinced that the order granting a judgment n.o.v. is separate and distinct from the order granting a new trial, and that the form of the order does not make the reasons assigned for the former order applicable to the latter. If it had been intended to make those reasons applicable to the order granting a new trial, there would have been a colon after "premises," indicating that more than one order was based thereon, or a semicolon after the order granting judgment n.o.v. instead of a period. Neither the punctuation nor the form of the order supports the contention of the appellants; and the announced intention of the trial judge that there should be a general order for a new trial without the assignment of any reason therefor, is effectuated by the order entered.

We have held again and again that, on an appeal from such an order, our inquiry is limited to the determination of the question of whether the evidence was sufficient to take the case to the jury, and that, unless we can say that the verdict of the jury was as a matter of law the only verdict that could be rendered, the order granting a new trial must be affirmed. The reasons for and against this holding are well stated in the majority opinion and the dissent in

*Bond v. Ovens,* 20 Wn. (2d) 354, 147 P. (2d) 514, and further discussion would avail nothing. The jury clearly could have returned a verdict adverse to the appellants.

The order granting a judgment n.o.v. and the dismissal predicated thereon are reversed and set aside; and the alternative order granting a new trial is affirmed.

MALLERY, C. J., BEALS, and STEINERT, JJ., concur.

SIMPSON, J., (dissenting)—In my opinion, the trial court acted correctly in granting judgment n.o.v. I therefore dissent.

---

February 21, 1949. Petition for rehearing denied.

