[No. 37256-8-II.   Division Two.   November 24, 2009.]

KI SIN KIM, *Respondent*, v. ALLSTATE INSURANCE COMPANY, INC., ET AL., *Petitioners*.

340

*Morgan E. Smith* and *Rory W. Leid* (of *Cole Lether Wathen & Leid PC*), for petitioners.

*Douglas E. Wilson* (of *Law Office of Douglas E. Wilson*), for respondent.

¶1 QUINN-BRINTNALL, J. — On July 1, 2005, Ki Sin Kim was injured when a car driven by an uninsured motorist crossed the center line and collided head-on with her car. On July 21, 2005, Kim filed claims requesting coverage for her medical bills and wage loss under the personal injury protection (PIP) and uninsured motorist (UIM) provisions of her Allstate Insurance Company Inc. insurance policy. Allstate investigated and, on January 31, 2006, denied coverage because Kim had misrepresented the nature and extent of her injuries and her ability to work. Kim sued Allstate for nonpayment, arguing that it acted in bad faith and in violation of the Consumer Protection Act (CPA), ch. 19.86 RCW, when it refused to pay her emergency room bills and when it "merged" her UIM and PIP files. Allstate moved for summary judgment, arguing that under the "void for fraud" provision of the policy, Kim's material misrepresentations voided the policy. Kim filed a cross motion for summary judgment on the issues of bad faith and violation of the CPA. Finding that there were material issues of disputed fact, the trial court denied Allstate's summary

judgment motion, but it granted Kim's summary judgment motion on her bad faith and CPA claims. We granted Allstate's motion for discretionary review.

¶2 Because a material issue of disputed fact exists regarding the materiality and effect of Kim's lies on the policy coverage provisions, we affirm the trial court's denial of Allstate's summary judgment motion. But because Kim's material misrepresentations preclude a finding that Allstate acted in bad faith in violation of the CPA as a matter of law, we reverse the trial court's summary judgment on Kim's CPA claim and remand for entry of summary judgment in favor of Allstate on those claims.

## FACTS

FACTUAL BACKGROUND

¶3 On July 1, 2005, an uninsured motorist struck Kim while she drove home from her work as a cook at the Yoko Teriyaki restaurant in Milton, Washington. At the time of the accident, Kim had automobile insurance through Allstate, including PIP and UIM coverage. An ambulance took Kim to the emergency room at Tacoma General Hospital, where she received x-rays and computed axial tomography (CAT) scans of her head, abdomen, pelvis, and legs. Kim suffered a three- to four-inch laceration on her scalp and soft tissue swelling on the upper right side of her head as well as contusions on her left knee and left ankle. Kim's hospital records indicate that she did not experience any (1) traumatic abdominal or pelvic abnormalities; (2) fractures, dislocations, soft tissue swelling, or joint effusion in her left knee; or (3) fractures or soft tissue swelling in her ankle.

¶4 On July 21, 2005, Kim submitted a claim to Allstate for her medical expenses and lost wages under the PIP and UIM provisions of her automobile insurance policy with Allstate. The terms of Allstate's policy state that Allstate "may not" provide coverage if an insured intentionally misrepresents any material fact regarding the insured's claims. Specifically, the policy states:

**Fraud or Misrepresentation**

. . . .

> [Allstate] may not provide coverage for any insured who has made fraudulent statements or engaged in fraudulent conduct in connection with any accident or loss for which coverage is sought under this policy.

Clerk's Papers (CP) at 77.

¶5 In Kim's proof of loss statement, she indicated that the entire left side of her body hurt, particularly her shoulders, left ankle, and left knee, and that she also suffered from neck and back pain. Kim also indicated that, as a result of her injuries, she had not been able to return to work. As part of its investigation of Kim's claim, Allstate hired a private investigator, John Maucotel, to observe Kim's activities on September 20 and 22, 2005. Maucotel reported that, over the course of both days, he saw Kim "walking, driving, turning her head from side to side . . . and working in the kitchen of Yoko Teriyaki." CP at 45. Specifically, he reported that Kim worked at the restaurant for approximately four hours on each day. Maucotel did not see Kim use any "medical apparatus or support devices" on either day.

¶6 On October 7, 2005, Kim submitted a wage and salary verification form to Allstate, stating that she had not returned to work since the date of her accident and was seeking reimbursement for those lost wages from Allstate.

¶7 On October 10, 2005, Kim completed an independent medical examination (IME) with Dr. David Nicholes.[1] As part of the IME, Nicholes reviewed Kim's medical records, completed a chiropractic examination of Kim, and viewed the surveillance tapes that Maucotel had recorded. Accord-

---

[1] In her statement of the case, Kim suggests that Dr. Nicholes was not qualified to perform the IME because, as a chiropractor, he is not "qualified to testify about any aspect of [Kim's] treatment received from licensed emergency medical doctors." Br. of Resp't at 10. But Allstate did not order the IME to review the care Kim received during her medical stay; Dr. Nicholes performed the IME to corroborate and verify Kim's protracted injuries. Moreover, Kim had previously sought care from a chiropractor.

ing to Nicholes's report, Kim described her symptoms as "neck pain, severe headaches, left ankle swelling, and dizziness." CP at 109. She told Nicholes that she was "barely able to drive" because of her "leg pain." CP at 109. Kim also told him on at least three occasions that she has been unable to work since the accident. Kim further stated that she used crutches for two months after the accident and that standing for longer than 30 minutes caused neck pain.

¶8 Before Dr. Nicholes began the physical examination, he reviewed Kim's medical records since the accident. Kim's medical records included an intake form from a July 5, 2005 visit to the Oh Family Chiropractic Center, where Dr. Changik Oh treated her. In the intake form, Kim complained of pain in her "neck, shoulders, head, hand, feet, back," as well as "light headedness, low back pain, nervousness[,] . . . jaw pain, bilateral arm pain, low back stiffness, tension, neck stiffness, [and] swallowing difficulties," but that overall she felt her symptoms were improving. CP at 106. The intake form did not mention that Kim suffered from ankle pain. The handwriting on the intake form was not Kim's; instead, it matched the handwriting on the examination form and the chart notes. Curiously, the intake forms identify Kim as male.

¶9 Kim's records also included an intake form from a July 7, 2005 visit to the Life Chiropractic Clinic, where Dr. Kwang Lee treated her. Kim's intake form indicated that her symptoms included pain in her neck, chest, back, ribs, and both legs, and that she was suffering from headaches. Kim's pain diagram noted multiple areas of pain, including her "knees, anterior ribs, head, upper back, arms, and low back." CP at 107. The pain chart does not indicate ankle pain. For unknown reasons, Dr. Oh's office submitted a second set of these original records, also dated July 7, 2005. The second intake form added the additional chief complaint of "head surgery and stitched" that was not on the original documentation. CP at 107. The second pain diagram adds that Kim is suffering from "left ankle pain." CP at 107. There was no

documentation regarding when these additions were made, who made these additions, or why these additions were made. According to Dr. Nicholes, medical professionals should create medical records contemporaneously with the patient's visit, and any individual who modifies those records should initial and date the modification and include the reason for the modification.

¶10 When Dr. Nicholes examined Kim's left ankle, he did not observe any "obvious swelling," but when he initially palpated the ankle, Kim "pulled away and winced," stating that the pain was "severe." CP at 111. But a few moments later when she was distracted, Nicholes again "palpated her left ankle [this time] quite deeply" and she did not complain of any pain or discomfort. CP at 111. Moreover, Nicholes found that Kim had "full, unrestricted inversion, eversion, flexion, and extension of the ankle with no pain" and that she had "no muscle weakness." CP at 111.

¶11 Dr. Nicholes also noted that, when Kim presented for the interview and examination, she "was limping significantly on her left leg, . . . was very unsteady on her feet[,] and complained of much pain in her left ankle." CP at 113. Nicholes described Kim's presentation as being characterized by "grunting, groaning and grimacing with all examination procedures," but that her examination was inconsistent; for example, when her lower extremity testing was conducted, she complained of pain in her shoulder, and there is no "anatomic, physiologic, or neurologic association with left shoulder pain and the orthopedic tests that [Nicholes] conducted." CP at 113. Moreover, Nicholes determined that Kim's "apparent limping [was] not credible." CP at 115. Specifically, he indicated that the nature of her limp was inconsistent with that of a person who was actually suffering from an ankle injury. According to Nicholes, "[w]hen a person with an ankle injury limps and favors a lower extremity, they place their foot on the floor and very carefully apply weight to advance their gait and then quickly remove the weight from that leg." CP at 115. In

contrast, Kim "walked on her left leg by putting all the pressure on her heel, forcing her foot up and carrying her weight on her heel." CP at 115.

¶12 Despite Kim's disproportionate number of subjective complaints, Dr. Nicholes could not find any objective explanations for her condition; instead, Nicholes found that Kim had "normal reflexes, normal sensation, and normal muscle tone," and that she had far greater range of motion when Nicholes was not performing tests than when he was.[2] CP at 115. Moreover, he found that Kim's activities as described by Maucotel were "in marked contrast to her presentation" during the October IME and Kim has "no restrictions in her occupational activities, no apparent restrictions in driving, and no demonstration of pain or inability to perform any activities." CP at 114-15. As a result of Kim's inconsistent and inappropriate presentation, Nicholes concluded that Kim "feigned her physical injuries and presentation during examination." CP at 115.

¶13 On October 11, 2005, one day after the IME, Maucotel again observed Kim walking in an uninterrupted and fluid manner, without a pronounced limp as she had been walking in Dr. Nicholes's presence. Nicholes watched Maucotel's video surveillance and noted that Kim's presentation on the video surveillance the day following the examination reinforced his opinion that she had feigned both her injuries and her presentation during his examination.

¶14 On October 26, 2005, Kim completed a recorded statement regarding the accident and her injuries. She said that she understood that Allstate could deny her claim if she misrepresented or concealed any information from Allstate. She testified that she had not worked since the day

---

[2] For example, at one point during the examination, Kim's daughter stated that she saw an insect on the examination bench; from a supine position, Kim jumped off the table to look for the insect, which she was unable to find. When Kim lay back down on the bench, Dr. Nicholes asked her to do a half sit-up, which she was unable to perform to any degree even though she had just inadvertently performed the same movement moments earlier.

of the accident due to her leg pain because if she stood for more than an hour or an hour and a half, her left knee and left ankle would begin to tingle and feel numb. She also testified that she was unable to walk around for more than an hour and a half without her shoulder and ankle hurting.

¶15 On November 21, 2005, Kim completed another examination under oath in which she reiterated that she had not been back to work since the day of the accident in any capacity because of her leg pain. When asked if she had been back to Yoko Teriyaki for any reason since the accident, she testified that she had been there once or twice—once to have lunch and once just to "stop[ ] by." CP at 33. Although she stated she had returned to Yoko Teriyaki, she repeated that her leg, shoulder, and arm pain prevented her from returning to work.

¶16 On January 31, 2006, Allstate sent a letter to Kim's attorney notifying her that it denied her benefits claim. The letter referenced the "Fraud or Misrepresentation" clause from Kim's policy and described her alleged misrepresentations as follows:

> [Kim] stated that she was unable to stand or walk for longer than [30 minutes] due to pain and tingling in her left leg, knee, and ankle. She later testified that she couldn't move around for longer than [one and a half] hours due to her left leg, knee, and ankle pain. She also informed [Dr. Nicholes] during her [IME] that she could barely drive after the collision due to her injuries and pain. Furthermore, she informed Dr. Nicholes that she could not stand for longer than [30 minutes] otherwise she experienced neck pain. [Maucotel] conducted surveillance on three separate occasions and obtained photographs and videotape of [Kim] walking in and out of various stores with a normal gait and in an uninterrupted and fluid manner. Furthermore, surveillance shows [Kim] consistently driving, without limitation or restricted motion.
>
>    . . . Dr. Nicholes determined that [Kim's] limping behavior was not consistent with a legitimate ankle injury. Furthermore, Dr. Nicholes determined that [Kim's] subjective complaints were not consistent with his objective clinical findings.

In addition, surveillance conducted [the day after] her IME, directly contradict[ed] many of [Kim's] subjective complaints and alleged injuries.

[Kim] consistently misrepresented and concealed material facts regarding her inability to work following the motor vehicle collision. [Kim] repeatedly testified that she was unable to work following the collision due to her ongoing pain. However, surveillance demonstrated [Kim] working in the kitchen at Yoko Teriyaki during the same time period that [Kim] made a claim to Allstate for wage loss benefits.

CP at 118.

PROCEDURAL HISTORY

¶17 On February 1, 2007, Kim sued Allstate for breach of contract, alleging that Allstate acted in bad faith and in violation of the CPA when it denied her claim.

¶18 On September 19, 2007, Allstate deposed Kim for a third time. At this time, Kim admitted that she had worked at Yoko Teriyaki for "about three hours" on "several" occasions in September 2005, when other employees could not make their shifts; she indicated that she scooped rice, packaged to-go food orders, and put clean dishes away. CP at 38. She further testified that these duties were the same as her duties before the accident, except that prior to the accident she also stir-fried vegetables in a wok. Kim stated that the owner of Yoko Teriyaki paid her in cash in exchange for her work during this time period.

¶19 Allstate and Kim each moved for partial summary judgment. Allstate moved for partial summary judgment, asking the trial court to find, as a matter of law, that Kim misrepresented numerous material facts when she presented her claim to Allstate and that, as a result, her policy was void. Specifically, Allstate pointed to Kim's misrepresentations regarding her wage loss and the extent of her injuries. Kim also moved for summary judgment, arguing that Allstate had committed bad faith by merging its PIP and UIM claims investigations and committed bad faith by unreasonably failing to pay her emergency room bills. As a

result of its bad faith, Kim alleged that Allstate had violated the CPA.

¶20 The trial court denied Allstate's motion for summary judgment, finding that genuine issues of material fact existed as to whether Kim misrepresented the extent of her injuries and her ability to work to Allstate during its investigation. The trial court granted Kim's motion for summary judgment. We granted Allstate's motion for discretionary review of the trial court's order granting Kim's motion for summary judgment.

## ANALYSIS

¶21 Allstate contends that the trial court erred when it granted summary judgment in Kim's favor, finding that Allstate acted in bad faith in violation of the CPA, after it denied Allstate's motion for summary judgment and determined that a genuine issue of material fact exists as to whether Kim intentionally misrepresented material facts to Allstate in the presentation of her claim. Specifically, Allstate argues that the trial court's summary judgment orders are irreconcilable because if Kim intentionally misrepresented a material fact to Allstate, her claims against Allstate for bad faith and violation of the CPA must fail. *Mut. of Enumclaw Ins. Co. v. Cox*, 110 Wn.2d 643, 652, 757 P.2d 499 (1988) (a finding of fraud precludes recovery under the CPA based on insurance company's bad faith because the purpose of the CPA is not served by awarding a windfall to an insured guilty of fraud). Allstate asks us to hold that Kim's misrepresentations were material and intentional.

¶22 Although the record clearly establishes that Kim made misrepresentations regarding her ability to work as well as the nature and extent of her injuries, in light of the equivocal language in Allstate's policy, a genuine issue of material fact remains as to the materiality of those misrepresentations with respect to Kim's emergency room visit.

STANDARD OF REVIEW

¶23 We review an order on summary judgment de novo, engaging in the same inquiry as the trial court. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93 P.3d 108 (2004); *Sea-Pac Co. v. United Food & Commercial Workers Local Union 44*, 103 Wn.2d 800, 802, 699 P.2d 217 (1985). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). We view all facts in the light most favorable to the nonmoving party. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). Summary judgment is appropriate only if reasonable persons could reach but one conclusion from all the evidence. *Vallandigham*, 154 Wn.2d at 26. Although the reversal of an order granting summary judgment to one party does not necessarily mean that this court should order that the trial court grant the other party's motion for summary judgment, that may be an appropriate remedy in a case where the two motions take diametrically opposite positions. *Weden v. San Juan County*, 135 Wn.2d 678, 710, 958 P.2d 273 (1998); *Estate of Spahi v. Hughes-Nw., Inc.*, 107 Wn. App. 763, 776-77, 27 P.3d 1233, 33 P.3d 84 (2001) (upon reversal of summary judgment, a grant of summary judgment to the other party can be an appropriate remedy where the two motions take diametrically opposite positions on the dispositive legal issue and raise no issues of fact).

MATERIAL MISREPRESENTATIONS

¶24 Interpretation of insurance policies is a question of law, and we construe insurance policies as a whole, giving each clause force and effect. *Pub. Util. Dist. No. 1 of Klickitat Cnty. v. Int'l Ins. Co.*, 124 Wn.2d 789, 797, 881 P.2d 1020 (1994). We give the terms of a policy the "fair,

reasonable, and sensible construction" that the average person purchasing insurance would give the contract. *Sears v. Grange Ins. Ass'n*, 111 Wn.2d 636, 638, 762 P.2d 1141 (1988) (citing *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wn.2d 901, 907, 726 P.2d 439 (1986)), *overruled on other grounds by Butzberger v. Foster*, 151 Wn.2d 396, 408, 89 P.3d 689 (2004). We construe ambiguities in an insurance policy against the insurer. *Allstate Ins. Co. v. Peasley*, 131 Wn.2d 420, 424, 932 P.2d 1244 (1997).

¶25 Here, the terms of Allstate's policy state that Allstate may not provide coverage if an insured intentionally misrepresents a material fact regarding her claims. Specifically, the policy states:

**Fraud or Misrepresentation**

. . . .

[Allstate] may not provide coverage for any insured who has made fraudulent statements or engaged in fraudulent conduct in connection with any accident or loss for which coverage is sought under this policy.

CP at 77. Washington courts have upheld "void for fraud" provisions where the policy expressly states that an insured is not entitled to coverage if that insured intentionally misrepresents or conceals a material fact regarding a claim, and that such misrepresentations will void the entire policy. *See, e.g., Cox*, 110 Wn.2d at 650; *Wickswat v. Safeco Ins. Co.*, 78 Wn. App. 958, 970-71, 904 P.2d 767 (1995), *review denied*, 128 Wn.2d 1017 (1996); *St. Paul Mercury Ins. Co. v. Salovich*, 41 Wn. App. 652, 659, 705 P.2d 812, *review denied*, 104 Wn.2d 1029 (1985). Courts will enforce such a clause regardless of whether the misstatements prejudiced the insurance company. *Cox*, 110 Wn.2d at 649. An insured need make only one material misrepresentation to void all coverage under the entire policy. *Onyon v. Truck Ins. Exch.*, 859 F. Supp. 1338, 1341 (W.D. Wash. 1994).

¶26 The key question here is whether Kim's misrepresentations were material. *See Cox*, 110 Wn.2d at 649. A misrepresentation is material if it involves a fact that is

relevant to a claim or the investigation of a claim. *Onyon*, 859 F. Supp. at 1341. While materiality is generally a mixed question of law and fact, we may decide the issue as a matter of law " 'if reasonable minds could not differ on the question.' " *Onyon*, 859 F. Supp. at 1341 (quoting *Long v. Ins. Co. of N. Am.*, 670 F.2d 930, 934 (10th Cir. 1982)); *see also Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 485, 78 P.3d 1274 (2003) (questions of fact may be determined on summary judgment as a matter of law where reasonable minds could reach but one conclusion (citing *Ruff v. County of King*, 125 Wn.2d 697, 703-04, 887 P.2d 886 (1995))).

¶27 Materiality is determined from the standpoint of the insurer, not the insured. *Onyon*, 859 F. Supp. at 1342. A misrepresentation is material " 'if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented.' " *Onyon*, 859 F. Supp. at 1341 (quoting *Long*, 670 F.2d at 934); *see also Pac. Indem. Co. v. Golden*, 791 F. Supp. 935, 938 (D. Conn. 1991) (restating the standard as: " 'the materiality requirement is satisfied if the false statement concerns a subject relevant and germane to the insurer's investigation as it was then proceeding' " (quoting *Fine v. Bellefonte Underwriters Ins. Co.*, 725 F.2d 179, 183 (2nd Cir.), *cert. denied*, 469 U.S. 874 (1984))), *rev'd*, 985 F.2d 51, 56 (2d Cir. 1993).

¶28 In order to avoid liability based on a material misrepresentation, the insurance company must demonstrate that the insured knowingly made the untrue representations and that, in making those representations, the applicant intended to deceive the company. *Kay v. Occidental Life Ins. Co.*, 28 Wn.2d 300, 301, 183 P.2d 181 (1947) (citing *Houston v. N.Y. Life Ins. Co.*, 159 Wash. 162, 292 P. 445 (1930)). But if an insured knowingly makes a false statement, courts will presume that the insured intended to deceive the insurance company. *Kay*, 28 Wn.2d at 302 (citing *Quinn v. Mut. Life Ins. Co.*, 91 Wash. 543, 158 P. 82 (1916)); *see also Day v. St. Paul Fire & Marine Ins. Co.*, 111 Wash. 49, 189 P. 95 (1920). If the insured knowingly made a false statement, the burden shifts to the insured to

356

establish an honest motive or an innocent intent. *Kay*, 28 Wn.2d at 302 (citing *Day*, 111 Wash. 49). The insured's bare assertion that she did not intend to deceive the insurance company is not credible evidence of good faith and, in the absence of credible evidence of good faith, the presumption warrants a finding in favor of the insurance company. *Kay*, 28 Wn.2d at 302 (citing *Day*, 111 Wash. 49).

¶29  When an insured intentionally makes material misrepresentations regarding a claim for insurance coverage, any claim by the insured against the insurance company for bad faith[3] and CPA[4] violations must fail. *Cox*, 110 Wn.2d at 652 (a finding of fraud precludes recovery under the CPA based on insurance company's bad faith because the purpose of the CPA is not served by awarding a windfall to an insured guilty of fraud); *Tornetta v. Allstate Ins. Co.*, 94 Wn. App. 803, 810-11, 973 P.2d 8, *review denied*, 138 Wn.2d 1012 (1999); *Wickswat*, 78 Wn. App. at 970-71.

¶30  Here, the trial court's denial of Allstate's motion for summary judgment based on its finding that a genuine issue of material fact existed as to the materiality and intentionality of Kim's misrepresentations cannot be reconciled with its finding that Allstate acted in bad faith and in violation of the CPA claims and ordering summary judgment in Kim's favor. If the trial court ultimately found that Kim intentionally misrepresented a material fact, her bad faith and CPA claims would fail. As a result of this internal

[3] To demonstrate that Allstate acted in bad faith, Kim must demonstrate that Allstate's actions were unreasonable, frivolous, or unfounded. *See Smith*, 150 Wn.2d at 484. Reasonableness of an insurer's actions is a complete defense to any bad faith claim by an insured. *Smith*, 150 Wn.2d at 486 (the insurer is entitled to summary judgment if reasonable minds could not differ that it denied coverage based on reasonable grounds).

[4] To prove a CPA claim, Kim must prove (1) an unfair or deceptive act or practice (2) occurring in trade or commerce (3) that impacts the public interest, (4) causes injury to her business or property, and (5) that the injury was proximately caused by the unfair or deceptive act. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986). Whether an act or practice is actionable under the CPA is a question of law. *Dombrosky v. Farmers Ins. Co. of Wash.*, 84 Wn. App. 245, 260, 928 P.2d 1127 (1996), *review denied*, 131 Wn.2d 1018 (1997). If there is a reasonable basis for the insurer's actions, those actions are not in violation of the CPA. *Dombrosky*, 84 Wn. App. at 260.

inconsistency, we review the entire record de novo and determine whether reasonable minds could differ as to whether Kim intentionally misrepresented material facts regarding her claim to Allstate. We hold that reasonable minds could not differ: Kim intentionally misrepresented material facts as to her ability to work as well as the nature and extent of her injuries.

¶31 As an initial matter, it is important to note that Kim does not dispute that she misrepresented to Allstate her ability to work and the nature and extent of her injuries. Instead, Kim claims that her various misrepresentations were not material because her wage loss claims were "collateral, at best" to her other claims. Br. of Resp't at 10. Specifically, Kim argues that her wage loss claims were collateral because she was primarily concerned with reimbursement for her emergency room visit and other medical bills. Kim points to *Allstate Insurance Co. v. Huston*, 123 Wn. App. 530, 94 P.3d 358 (2004), *review denied*, 153 Wn.2d 1021 (2005), to support her proposition that "simple" errors do not constitute a material misrepresentation and cannot be grounds to void coverage. But *Huston* does not hold that a "simple" error does not constitute a material misrepresentation; instead, it supports the premise that a "misrepresentation is material if, when made, it *could have* affected the insurer's investigation." 123 Wn. App. at 539.

¶32 The factual scenario here is analogous to that in *Cox*, where the insured, Cox, purchased a homeowners insurance policy from the plaintiff, Mutual of Enumclaw Insurance Company (MOE), which covered, among other things, his home, and unscheduled personal property. 110 Wn.2d at 645. Unlike the policy at issue here, the MOE policy in *Cox* explicitly provided that in the event of " *'Misrepresentation, Concealment, or Fraud*—[the] entire policy is void.' " 110 Wn.2d at 646 (emphasis added). A fire subsequently destroyed Cox's home and personal property; shortly thereafter, he submitted an itemized inventory of his unscheduled personal property. *Cox*, 110 Wn.2d at 645. During its investigation, MOE found no trace of certain items claimed lost

and, when confronted, Cox denied fraud but admitted making "mistakes" on the inventory list. *Cox*, 110 Wn.2d at 646. MOE thereafter filed a declaratory judgment action, claiming that the policy was void because Cox had violated the policy's antifraud provision. *Cox*, 110 Wn.2d at 646. Cox counterclaimed that MOE had acted in bad faith and violated the CPA while processing his claim. *Cox*, 110 Wn.2d at 646-47. Our Supreme Court held that Cox's attempt to defraud MOE barred him from recovering for his claims of bad faith under the CPA. *Cox*, 110 Wn.2d at 648.

¶33 Here, like the insured in *Cox*, Kim misrepresented facts material to her claim: she misrepresented her ability to work as well as the nature and extent of her injuries following her visit to the emergency room. These are facts that a reasonable insurance company would have found important with respect to her wage loss and medical reimbursement claims. *See Onyon*, 859 F. Supp. at 1341. In her first two sworn statements, Kim stated unequivocally that she had not worked in any capacity since her accident. And, like *Cox*, Kim later admitted that, despite her previous claims to the contrary, she had worked several shifts at Yoko Teriyaki in September 2005 and had been paid cash for her efforts. Moreover, Allstate's investigator, Maucotel, obtained video surveillance of Kim working two four-hour shifts—one on September 20 and the other on September 22.

¶34 Kim also claimed that she was experiencing severe leg pain that prevented her from walking or standing for extended periods of time or driving without difficulty. When Kim arrived for her appointment with Dr. Nicholes, she presented with a pronounced limp that was inconsistent with a genuine injury and, although she winced and pulled away in pain when Nicholes initially examined her ankle, he later "palpated her left ankle quite deeply" when she was distracted and Kim did not react at all. CP at 111. In addition, the same video surveillance that showed Kim working several shifts at Yoko Teriyaki on September 20

and 22 also shows Kim walking and driving without any difficulty. Moreover, Nicholes watched video surveillance taken just one day after Kim's IME and noted that Kim was walking in a fluid and uninterrupted manner, without the pronounced limp that she had the day before.[5]

¶35 In her declaration, Kim suggests that any misrepresentations she made were as a result of her language barrier and her below-average intelligence. But Kim had an interpreter as well as her attorney present at all her depositions, as well as at her IME. She also baldly asserts in her declaration that she did not intend to deceive Allstate; but Kim's mere assertion that she did not intentionally make misrepresentations to Allstate is insufficient to overcome the presumption that she deliberately deceived Allstate when she knowingly made false statements about her ability to work and the nature and extent of her injuries following her emergency room visit. *See Kay*, 28 Wn.2d at 302. Kim fails to offer any evidence of good faith or an honest intent. *See Kay*, 28 Wn.2d at 302.

¶36 Although Kim made misrepresentations regarding both her ability to work and the nature and extent of her injuries following her emergency room visit, in light of the equivocal language in Allstate's policy, the materiality of those misrepresentations is an issue of fact that remains. *See, e.g., Olson v. Bankers Life Ins. Co. of Neb.*, 63 Wn.2d 547, 552, 388 P.2d 136 (1964) (materiality of misrepresentations in an application for life insurance to the insurer's acceptance of the risk or hazard is an issue of fact for trier of fact); *see also Baker v. Mut. Life Ins. Co. of N.Y.*, 32 Wn.2d 340, 351, 201 P.2d 893 (1949) (whether beneficiaries intended to deceive insurer in knowingly ratifying insured's misrepresentations in application for life insurance so as to void policy was a jury question). Unlike *Cox*, where the insurance policy unequivocally stated that the " 'entire policy is void' " if the insured " 'willfully concealed or mis-

---

[5] In addition, it appears that either Kim or one of her providers altered Kim's medical records to add complaints that were not present or identified on the first set of intake forms.

represented . . . any material fact,' " the Allstate policy at issue here is less clear. 110 Wn.2d at 646. Instead, it states that Allstate "*may* not provide coverage for any insured who has made fraudulent statements or engaged in fraudulent conduct in connection with any accident or loss for which coverage is sought under this policy." CP at 77 (emphasis added). *See Levy v. N. Am. Co. for Life & Health Ins.*, 90 Wn.2d 846, 852-53, 586 P.2d 845 (1978) (whether insured's failure to disclose medical condition in response to insurance application question constituted a material misrepresentation was a question of fact for the jury); *Huston*, 123 Wn. App. at 539-40 (whether insured's misrepresentations within meaning of insurer's clause were material was a question for the jury).

¶37 Here, if Allstate's policy contained the clear and unequivocal language addressed in the MOE policy in *Cox*, Kim's entire policy, including Allstate's obligation to pay the cost of her emergency room visit, would have been entirely void based on her misrepresentations. But Allstate's policy at issue here leaves the extent of Allstate's insurance obligation to Kim regarding her emergency room visit open to interpretation. First, Allstate does not suggest, nor is there any evidence in the record, that Kim made any misrepresentations, material or otherwise, during her initial visit to the emergency room. Moreover, Allstate's use of the word "may" makes it unclear under which circumstances it will choose to deny coverage and to what extent its obligation is relieved by misrepresentations.

¶38 Here, the trial court's denial of Allstate's motion for summary judgment and grant of Kim's motion for summary judgment are inconsistent and cannot stand. Although the trial court's decision to deny Allstate's motion for summary judgment was sound in light of Allstate's equivocal policy language, questions remain for the trier of fact regarding the materiality of Kim's misrepresentations. Allstate's obligation to cover the costs of Kim's emergency room visit is an open question best decided at trial on remand.

CPA C~LAIM~

■ ¶39  But the record clearly establishes that the trial court erred when it granted Kim's motion for summary judgment. Careful review of the record clearly demonstrates that Kim knowingly and intentionally misrepresented both her ability to work following her accident and the nature and extent of her injuries following her visit to the emergency room. These material misrepresentations relieve Allstate of its obligation to pay Kim's lost wage claim and her post-emergency-room medical bills and negate a finding that Allstate acted in bad faith or in violation of the CPA, ch. 19.86 RCW, when it denied her claim.

¶40  Moreover, although it is not necessary for us to reach this issue for resolution of this appeal, we note that Kim's argument that Allstate acted in bad faith when it simultaneously investigated her PIP and UIM claims is without merit and, to the extent that the trial court relied on that argument in making its summary judgment decision on the CPA claim, it erred.

¶41  Kim argues that Allstate acted in bad faith when it "commingled" its UIM and PIP files with respect to Dr. Nicholes's IME report because (1) as the UIM provider, Allstate should not have been permitted to compel Kim to undergo an IME and (2) Allstate improperly commingled the UIM and PIP files when it placed the results of the IME, which Kim argues is proper only in the PIP context, in Kim's UIM file.

■ ¶42  When an insurer defends its insured under a "reservation of rights," the insurer is nearly a fiduciary of the insured. *Ellwein v. Hartford Accident & Indem. Co.*, 142 Wn.2d 766, 779, 15 P.3d 640 (2001), *overruled on other grounds by Smith*, 150 Wn.2d 478. While in the liability coverage context, the insurer does not have to place the insured's interests above its own interests, it must give " 'equal consideration' " to the insured's interests. *Ellwein*, 142 Wn.2d at 779 (quoting *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 385-86, 715 P.2d 1133 (1986)). This

"enhanced obligation" to defend requires the insurance company to (1) thoroughly investigate the cause of the insured's accident and the nature and severity of the plaintiff's injuries; (2) retain competent defense counsel, recognizing that only the insured is the client; and (3) fully inform the insured not only of the reservation of rights defense itself but of all developments relevant to his or her policy coverage and the progress of the lawsuit. *Ellwein*, 142 Wn.2d at 779 (quoting *Tank*, 105 Wn.2d at 388).

¶43  In contrast, the relationship between a UIM insurer and its insured " 'is by nature adversarial and at arm's length.' " *Ellwein*, 142 Wn.2d at 779 (quoting *Fisher v. Allstate Ins. Co.*, 136 Wn.2d 240, 249, 961 P.2d 350 (1998)). UIM insurance provides an excess layer of coverage designed to provide full compensation for all amounts to which claimant is legally entitled where the tortfeasor is underinsured. *Ellwein*, 142 Wn.2d at 779-80. "Legally entitled to" is the operative phrase and, as a result, the UIM insurer " 'stands in the shoes' " of the tortfeasor, and its liability to the insured is identical to the underinsured tortfeasor's, up to the UIM policy limits. *Ellwein*, 142 Wn.2d at 780 (quoting *Dayton v. Farmers Ins. Group*, 124 Wn.2d 277, 281, 876 P.2d 896 (1994)).

¶44  Stated another way, UIM insurers are allowed to assert liability defenses available to the tortfeasor because UIM insurance is designed to put the insurance company in the position of the tortfeasor with liability insurance. This is because the injured party is not entitled to be put in a better position by having been struck by an uninsured motorist as opposed to an insured motorist. *Ellwein*, 142 Wn.2d at 780. Although the relationship between the insurer and the insured in the UIM setting is, by nature, adversarial, the duty of good faith and fair dealing applies because the insured retains the " 'reasonable expectation' " that he or she will be dealt with fairly and in good faith by his or her insurer. *Ellwein*, 142 Wn.2d at 780 (quoting *Craft v. Economy Fire & Cas. Co.*, 572 F.2d 565, 568-69 (7th Cir. 1978)).

¶45 Kim suggests that Allstate should not have been permitted to order an IME under her UIM policy because, under the UIM policy, Allstate "stands in the shoes" of the third party tortfeasor, and a third party tortfeasor would not be permitted to require an IME.[6] Br. of Resp't at 12. But Kim's argument ignores the fact that under either her PIP or UIM policy, Allstate can require that she submit to an IME as a condition of receiving coverage.[7] Moreover, despite Kim's argument to the contrary, a third party *would* be permitted to compel an IME, as would that tortfeasor's insurance company.[8] Allstate did not act in bad faith by requesting an IME.

¶46 Kim relies on *Ellwein* to support her argument that Allstate acted in bad faith when it used Dr. Nicholes's report in both its PIP and UIM investigations, which Kim urges should have been separate based on Allstate's differing positions under each type of claim.

---

[6] Kim also argues that Allstate acted in bad faith by taking multiple statements but fails to articulate how this constitutes "bad faith," other than asserting that the capacity in which Allstate's attorney was acting was unclear. In addition, Kim suggests that the way in which Allstate's attorney questioned her violated Allstate's "quasi-fiduciary duty" because this attorney owed a "duty of loyalty" to Kim and, thus, should not have "concealed the fact that he was aware of information that contradicted [Kim's] testimony." Br. of Resp't at 5. But Kim does not offer any further argument on either issue and, thus, we do not consider them. *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration."), *review denied*, 136 Wn.2d 1015 (1998).

[7] Courts construe insurance policies as contracts. *Austl. Unlimited, Inc. v. Hartford Cas. Ins. Co.*, 147 Wn. App. 758, 765, 198 P.3d 514 (2008) (citing *Quadrant Corp. v. Am. States Ins. Co.*, 154 Wn.2d 165, 171, 110 P.3d 733 (2005)). The court considers the policy as a whole and gives it a " 'fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.' " *Austl. Unlimited*, 147 Wn. App. at 765 (quoting *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 666, 15 P.3d 115 (2000)). Most importantly, if the policy language is clear and unambiguous, the court must enforce it as written and may not modify it or create ambiguity where none exists. *Austl. Unlimited*, 147 Wn. App. at 765-66 (citing *Quadrant*, 154 Wn.2d at 171). Thus, Kim entered into a contract with Allstate in which she agreed that it could request an IME as a condition of her receiving coverage under *both* her UIM and PIP policies.

[8] Under CR 35(a)(1) a court, "for good cause shown," may order a party to submit to a physical or mental examination when that party's physical or mental condition "is in controversy."

¶47 In *Ellwein*, the insured sued her insurer for bad faith in failing to pay the insured's UIM benefits. Ultimately, our Supreme Court held that the insurer acted in bad faith when it misappropriated the insured's accident reconstruction expert for use against her. *Ellwein*, 142 Wn.2d at 768. In *Ellwein*, the insured, Nancy Ellwein, was turning left in an intersection that was controlled by traffic lights when her car was struck by an oncoming vehicle. 142 Wn.2d at 768. As part of its liability investigation, Hartford hired an accident reconstructionist, William Cooper, on Ellwein's behalf. *Ellwein*, 142 Wn.2d at 769. Cooper determined that the other driver was speeding and had likely run the red light when he struck Ellwein's car. *Ellwein*, 142 Wn.2d at 769. Cooper submitted a report to that effect to Hartford. Hartford then wrote to the other driver's insurance company, asserting that Ellwein was not at fault for the accident. *Ellwein*, 142 Wn.2d at 770.

¶48 At the same time that Hartford was asserting a claim on Ellwein's behalf, it was also preparing to defend itself from a " 'potentially large' " UIM claim by Ellwein. *Ellwein*, 142 Wn.2d at 770. Hartford determined that because Cooper's report mentioned that the other driver may have been " 'there to be seen,' " it could be used to support a claim of comparative negligence against Ellwein. *Ellwein*, 142 Wn.2d at 769. Ellwein sought to arbitrate her UIM claim against Hartford; in response, Hartford implied that Cooper was its witness and that Cooper's conclusions might change as additional evidence was developed. *Ellwein*, 142 Wn.2d at 770-71. Hartford supplied Cooper with some additional reports and declarations that implicated Ellwein as the cause of the accident. Based on this information, Cooper revised his initial findings and conclusions almost entirely and asserted that Ellwein was solely to blame for the accident because she failed to yield to the oncoming driver. *Ellwein*, 142 Wn.2d at 771. Following an arbitration award, Ellwein sued Hartford for bad faith and violation of the CPA for " 'misappropriating' " Cooper and using him as its own witness after Ellwein made her UIM

claim. *Ellwein*, 142 Wn.2d at 772-73. Thus, the question at issue was whether a UIM insurer violates its duty of good faith by hiring an expert for its insured to aid in the insured's liability representation and then retaining that same expert to aid in *its* defense of an insured's UIM claim arising out of the same accident.

¶49 But the facts in *Ellwein* are inapposite to the facts here. Unlike *Ellwein*, Dr. Nicholes was not Kim's expert. An independent medical examiner is not analogous to an accident reconstructionist. As the policy provided under both her PIP and UIM policies, Allstate ordered that Kim participate in an IME to verify and corroborate the severity and nature of her existing injuries, not their cause. Moreover, the IME belongs to Allstate and clearly qualifies as its own work product. *See Harris v. Drake*, 116 Wn. App. 261, 273, 65 P.3d 350 (2003) (a subsequent third party claimant cannot compel the production of the PIP file because the PIP file, including the IME report, was the privileged work product of the insurer), *aff'd*, 152 Wn.2d 480, 99 P.3d 872 (2004).[9]

¶50 Because the record conclusively establishes that Kim made misrepresentations to Allstate regarding the extent and nature of her injuries as well as her ability to work, which were, at a minimum, material to her wage loss and outpatient treatment claims, we reverse the trial court's order granting summary judgment to Kim on her CPA and bad faith claims and remand for entry of summary

---

[9] Kim also takes language from this court's decision in *Harris* out of context, asserting that *Harris* actually stands for the proposition that a third party tortfeasor cannot compel the contents of an insured's PIP file because "the insured has a reasonable expectation that the information will be held in confidence." Br. of Resp't at 13 (citing *Harris*, 116 Wn. App. at 273). Kim asserts that this "confidentiality" requires Allstate to conduct two separate and independent investigations into Kim's UIM and PIP claims. But the "confidentiality" language in *Harris* was used to discuss the analogous relationship between information given by a PIP insured to a PIP insurer (either directly or through the PIP insurer's medical expert) to information given by a liability insured to a liability insurer (or the liability insurer's representative), not the ultimate question of whether the file ultimately qualified as work product. *Harris*, 116 Wn. App. at 273. Moreover, while *Harris* dealt with a situation involving litigation with a third party tortfeasor, the case at hand does not involve a third party; rather, it is a situation in which Kim, the insured, is seeking coverage from her insurer, Allstate. Thus, the principles of confidentiality in *Harris* are distinguishable.

judgment in favor of Allstate on those claims. But given the equivocal language of the policy's antifraud provision, we remand for trial on the materiality of these misrepresentations to Kim's claim for emergency room expenses.

PENOYAR, A.C.J., and HOUGHTON, J., concur.