[No. 34416-1-I.    Division One.    August 14, 1995.]

PAUL WICKSWAT, ET AL., *Appellants*, v. SAFECO INSURANCE COMPANY, *Respondent.*

*Kurt Lichtenberg*, for appellants.
*James T. Derrig* and *Robert F. Riede*, for respondent.

COLEMAN, J. — This case arises out of an insurance contract dispute between Paul Wickswat and Safeco Insurance Company. Safeco denied coverage for Wickswat's $200,000 theft claim, asserting that the theft had not occurred and that Wickswat had misrepresented and/or concealed facts material to the claim. Wickswat sued for breach of contract, bad faith handling of an insurance claim, and violation of the Consumer Protection Act (CPA). A jury found in Safeco's favor on the breach of contract claim and did not reach the other claims. Wickswat appeals, arguing that the trial court erred by: (1) giving the jury a special verdict form that precluded it from considering his bad faith and CPA claims; (2) denying his motion in limine to exclude evidence about his personal relationships and financial status; and (3) failing to correctly instruct the jury. We affirm the judgment.

## I

### FACTS

Wickswat is an avid model train collector who owned a large collection of Lionel model trains. In September 1991, Wickswat rented a cargo van to transport a significant portion of his postwar collection to Portland, Oregon, for a weekend train collectors' meet. After arriving in Portland on Friday, September 6, Wickswat learned that the exhibition hall was closed and that he could not bring his

trains inside until morning. That night, Wickswat left the van locked in a hotel parking lot. The next morning, the van doors were open and the van was empty.

Wickswat immediately reported the theft to the hotel manager and to the police. He then went to the exhibition hall and mentioned the theft to a friend, Rick Dunn. Around 9:30 A.M., Wickswat decided to return to Seattle. He called Hannalore Kelm, a woman with whom he was romantically involved, and asked her to pick him up at the Thrifty rental lot. When Kelm arrived in Seattle, she met Wickswat and they went to a restaurant. He did not tell Kelm that his trains had been stolen until several weeks later. Sunday evening, Wickswat returned home and told his wife about the theft.

On Monday, Wickswat reported the claim to his Safeco agent, Sheelah McFarland, submitting a comprehensive inventory list and estimating his loss at $216,770.[1] After an initial communication that the policy did not cover his loss, Safeco assigned Mary McCullough to investigate Wickswat's claim. McCullough met with Wickswat on September 11. He gave her two Greenberg Guides, a copy of the police report, two photo albums, and a packet of duplicate pictures. The next day, Wickswat called McCullough and told her that all of his inventory had been in original boxes and that half of the trains had never been run. Wickswat explained that these factors made the trains more valuable. Later, according to McCullough, Wickswat told her that only three of the fifty-seven Lionel sets stolen had original set boxes and that only seven to ten of the individual cars were in original boxes.

McCullough proceeded to investigate Wickswat's claim, looking into the value of the collection as well as the circumstances surrounding the claimed loss. First, McCullough inspected the van and found no evidence of a forced entry. According to Thrifty Rentals, no repairs had been

---

[1]Six months previously, Wickswat had directed McFarland to increase his personal property insurance limits. At that time, he estimated the value of his train collection at $100,000.

made after Wickswat returned the van. Second, McCullough contacted the hotel manager and the Portland police. The hotel manager indicated some surprise over the fact that Wickswat did not appear visibly upset over the theft, and Detective Linda Gross believed that, based on her investigation, the theft might be false. Third, McCullough spoke to Gary Wickwire, a train collector and dealer, who felt that the number of trains listed on Wickswat's inventory list could not have all fit into one cargo van. Fourth, McCullough sent a copy of Wickswat's inventory list to train collector Barry Keener, asking him to value the trains. Keener valued the inventory, without boxes, at $153,000. He stated that, in his twenty-five years of collecting, he had never seen a collection like Wickswat's. Fifth, McCullough discovered that Wickswat's initial version of events was inconsistent with his wife's version of events. Specifically, Wickswat told McCullough that he spoke to his wife on Saturday morning, told her about the theft, and asked her to pick him up at the Thrifty rental lot in Seattle. Linda Wickswat, on the other hand, stated that she did not pick him up on Saturday and that he did not tell her about the theft until Sunday. Sixth, McCullough observed that the photographs Wickswat gave her did not depict separate official Lionel sets, but showed the same car several times, a missing car, and/or cars that were not part of a set. Finally, McCullough learned that the Train Collectors Association (TCA) would not admit Wickswat into its membership.

In light of this information, Safeco decided to exercise its policy right to take Wickswat's examination under oath. In preparation for the examination, Safeco requested copies of Wickswat's income tax returns for the past several years. During the examination, Wickswat testified that the tax returns accurately reflected his income. As for the photographs, Wickswat testified that he had taken them over the years and that they were not necessarily intended to reflect a catalog set.

On April 27, 1992, approximately seven and one-half

months after Wickswat reported his loss, Safeco advised him that his claim for coverage had been denied, stating that, under the insurance policy, coverage does not apply when an insured has intentionally concealed or misrepresented any material fact, made false statements, and/or engaged in fraudulent conduct.[2] Wickswat responded by filing suit against Safeco for breach of contract, bad faith handling of an insurance claim, and violation of the CPA. On the bad faith claim, Wickswat alleged that Safeco acted without substantial justification by denying his claim. On the CPA claim, Wickswat alleged that Safeco violated numerous WAC provisions governing claims settlement practices. *See* WAC 284-30-330, -360, -380.

During discovery, Safeco uncovered additional information about Wickswat's financial and personal status. First, Safeco obtained a set of tax returns that Wickswat had submitted to Security Pacific Bank as part of a loan application. This set of returns showed over $200,000 of additional income that Wickswat had not claimed during the oath examination. Wickswat subsequently admitted that he had given the bank copies of unfiled tax forms. Second, Safeco obtained loan documents that Wickswat had submitted to Washington Mutual Bank. Again, the documents revealed that Wickswat had claimed an income substantially higher than what he had testified to at the oath examination. In addition, the loan documents showed that Wickswat had valued his train collection at only $100,000. Third, Safeco learned of another woman, Janet Anderson, with whom Wickswat had also been romantically involved. According to Anderson, Wickswat had confessed to her that he could be in trouble for insurance

---

[2]The insurance policy provides:

**Concealment or Fraud:** We do not provide coverage for any insured who has:

a. intentionally concealed or misrepresented any material fact or circumstance; or

b. made false statements or engaged in fraudulent conduct relating to this insurance.

fraud. Wickswat then suggested that he knew where the stolen trains were and asked Anderson if she would be willing to sell them for him. Anderson declined.

Both parties thereafter moved for partial summary judgment. Wickswat moved for partial summary judgment on Safeco's affirmative defense and his CPA and bad faith claims, arguing that there were no genuine issues of fact about concealment, misrepresentation, and/or Safeco's WAC violations. Safeco moved for partial summary judgment on Wickswat's contract claim, arguing that Wickswat had made material misrepresentations that precluded policy coverage as a matter of law. The trial court denied both motions, stating that there existed genuine issues of fact.

Prior to trial, Wickswat moved for an order in limine to exclude the following evidence: (1) his personal relationships with Kelm and Anderson; (2) his bank loan applications and tax returns; (3) his TCA membership application; and (4) the Portland police investigation. The trial court denied the motion, stating that the evidence was relevant to the issues of theft and/or bad faith. In particular, as to the evidence of Wickswat's personal relationships, the court stated that the issues of timing and statements made to a person in trust were relevant to bad faith, but the court limited the evidence so that no mention of the romantic or sexual aspect of the relationships could be made.

During opening arguments, defense counsel stated:

> Now, mind you, after he lost his $200,000, his set had been stolen, he did not call his wife and tell her about it. In fact, the evidence will show that he did not tell his wife about the trains being stolen until the next Sunday night. Rather, Mr. Wickswat called a friend of his, a close friend of his, Hanna Kelm, and he drove the van back on Saturday and had Hanna Kelm pick him up at the Thrifty Rental place, and then he went back to Hanna's place.

> Okay. In the investigation, Ms. McCullough took a recorded statement from Mr. Wickswat . . . , and in the course of taking that recorded statement from Mr. Wickswat, she asked

him about his activities that day, and one of the series of questions she asked was, "After this theft on Saturday, did you call home and tell your wife?" And he said, "Yes, I called my wife that morning." The evidence will show he did not call his wife that morning.

She also asked Mr. Wickswat, "Did your wife pick you up—what day did your wife pick you up?" And he said that Saturday, that afternoon. You'll find from the evidence that, in fact, she did not pick him up that Saturday afternoon.

Wickswat responded by moving for a mistrial, contending that defense counsel had violated the order in limine. The trial court denied the motion, stating that while defense counsel's argument violated the order, the violation was not intentional and did not likely impact the jury.

The evidence of Wickswat's personal relationships, however, continued to be problematic at trial. In particular, during their testimony, both Paul and Linda Wickswat volunteered evidence that the court had excluded. During one exchange with defense counsel, Wickswat disputed whether the statements he had made to McCullough about contacting his wife were intentionally made, stating that he had subsequently retracted his misrepresentations. Defense counsel argued that the door had been opened on this evidence. Prompted by the court, Wickswat agreed to stipulate that the statements were intentionally made:

THE COURT: Let me just say, it seems to me [the retraction] goes to the issue of which has been disputed factually of whether or not he intentionally was misleading, and I guess I want to hear, Mr. Lichtenberg, your response as to why if he is, one, testifying that these statements were not made intentionally, and, two, that he retracted them, which is essentially another way of saying they were not made intentionally, why is counsel now not entitled to explore that?

MR. LICHTENBERG: My recollection of what he said was that it caught him by surprise, and his interpretation of intentionally was sort of like premeditated, and I suppose that could be explored, but I don't think that—I mean, perhaps we need to explore a little more what you mean by intentionally.

THE COURT: Let me ask you this: Are you prepared at this point to agree that he intentionally made misrepresentations, these misrepresentations, the ones that have just been testified to?

MR. LICHTENBERG: I think in terms of a legal standard of what intentionally—I mean, I don't think it was—yeah, it probably was intentional, and I can discuss with my client whether he's willing to agree to stipulate.

THE COURT: Why don't you.

MR. LICHTENBERG: And the answer is going to be if we don't, that it will come in?

THE COURT: That's correct.

MR. LICHTENBERG: We'll say that.

The trial court added that it would not instruct the jury, at that point, whether Wickswat's stipulated misrepresentations were material or not, only that they were intentionally made.

Later, at various points in the case, Safeco moved for a directed verdict on three bases. First, Safeco moved for a directed verdict on Wickswat's bad faith and CPA claims, arguing that Wickswat's false misrepresentations were material, as a matter of law, and therefore precluded him from recovering on those claims. Second, Safeco moved for a directed verdict on Wickswat's contract claim, arguing that his material misrepresentations precluded policy coverage. The trial court rejected these first two arguments, stating that under the order denying summary judgment, the issue of materiality was a fact issue for the jury. Third, Safeco moved for a directed verdict on Wickswat's bad faith and CPA claims, arguing that there was no evidence in the record to support a finding that it had handled the claim in bad faith or violated any relevant WAC provisions. The trial court denied Safeco's motion on this basis as well, stating that, while the issue was close, the evidence was sufficient to put the claims before the jury.

By way of a special verdict form, the jury found that a

theft had occurred but that Wickswat had intentionally concealed and/or misrepresented material facts during the course of his claim, thereby precluding coverage. Given this finding, the jury did not reach Wickswat's bad faith and CPA claims. In particular, the special verdict form instructed the jury that if Wickswat had made material misrepresentations then, it need not address his bad faith and CPA claims. Wickswat appeals the judgment. Safeco cross-appeals the trial court's denial of its motion for partial summary judgment and its motion for a directed verdict.[3]

## II
### SPECIAL VERDICT FORM

Wickswat's primary contention on appeal is that the trial court erred by giving the jury a legally deficient verdict form. In particular, he argues that, as a matter of law, he was entitled to have the jury adjudicate his bad faith and CPA claims even though Safeco prevailed on its breach of contract defense. Safeco responds that Wickswat has failed to preserve this issue for appeal because he did not propose a legally correct form of his own. Alternatively, Safeco argues that even if the issue is properly before this court on appeal, the trial court gave the jury a proper verdict form based on the relevant Washington case law. While we find that Wickswat failed to properly except to the proposed verdict form, we nevertheless address the issue on the merits and conclude that the verdict form was properly given pursuant to *Mutual of Enumclaw Ins. Co. v. Cox*, 110 Wn.2d 643, 757 P.2d 499 (1988).

In *Queen City Farms v. Central Nat'l Ins.*, 126 Wn.2d 50, 882 P.2d 703 (1994), 891 P.2d 718 (1995), our supreme court stated that while there is no specific rule for properly objecting to special jury verdict forms, the rules governing instructional error apply by analogy. In

---

[3]Given our disposition of the case, we need not address Safeco's cross-appeal; the issues have been rendered moot.

this regard, the rule is that if a party is dissatisfied with an instruction, then that party has a duty to propose an appropriate instruction. If, in turn, the proposed instruction is not legally correct in every respect, then the party cannot complain about the court's failure to give it. *Hoglund v. Raymark Indus., Inc.*, 50 Wn. App. 360, 368-69, 749 P.2d 164 (1987) (citing *Martin v. Huston*, 11 Wn. App. 294, 299, 522 P.2d 192 (1974)), *review denied*, 110 Wn.2d 1008 (1988).

These requirements, however, do not preclude an appellate court from reviewing a claimed instructional error when the party has properly excepted pursuant to CR 51(f). *See Crittenden v. Fibreboard Corp.*, 58 Wn. App. 649, 655-56, 794 P.2d 554 (1990), 803 P.2d 1329 (1991); *St. Paul Mercury Ins. Co. v. Salovich*, 41 Wn. App. 652, 658-59, 705 P.2d 812, *review denied*, 104 Wn.2d 1029 (1985). Under this rule, a party enters a proper exception by " 'stat-[ing] distinctly the matter to which he objects and the grounds of his objection'." *Queen City*, 126 Wn.2d at 548 (quoting CR 51(f)). The purpose of this rule is to ensure that the trial court is sufficiently apprised of the points of law or questions of fact in dispute so that it has the opportunity to make corrections. *Queen City*, 126 Wn.2d at 548 (citing *Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 163, 795 P.2d 1143 (1990)). Under some circumstances, an appellate court will excuse technical noncompliance with the rule when the record shows that the complaining party sufficiently apprised the trial court of its objection. *Queen City*, 126 Wn.2d at 549.

In this case, Wickswat's proposed verdict form is not "correct" in every respect. In particular, in all three of Wickswat's proposed forms, he permits the jury to determine whether Safeco breached its fiduciary duty and award separate damages on that basis. Our supreme court has clearly stated, however, that the relationship between an insurer and an its insured does not constitute a true fiduciary relationship. *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 389, 823 P.2d 499 (1992). Therefore, under

*Butler*, Wickswat could not recover on the basis set forth in his proposed forms. Accordingly, he cannot now complain about the court's failure to give any one of his proposed special verdict forms.

Nevertheless, despite his failure to propose a correct verdict form, the issue remains whether Wickswat properly excepted to the special verdict form actually given. A review of the record reveals virtually no discussion about the special verdict form. During formal exceptions, Wickswat's attorney only briefly objected to the form, stating: "Then on the verdict form as we had discussed, failure to adopt one of my versions that got an answer to the amount of the loss if there was a theft and did not allow for the determination of whether there was bad faith if there is a determination of a material misrepresentation."

Normally, we would find such an exception inadequate to preserve error. Specifically, this exception does not sufficiently apprise the trial court of the reasons why the verdict form actually given was legally deficient. Indeed, there is no discussion of the point of law in question and the reasons for the exception. Rather, the above exception only addresses the trial court's failure to give the proposed verdict form.

■ Nonetheless, we address the issue here on the merits. Apparently, the content of the form was raised and discussed by the parties in chambers, although this discussion was not transcribed for purposes of appeal. Later, during formal exceptions, the trial court indicated that, given the prior discussion, the parties' "record will be made simply by noting the exception or objection." Given this statement, we find that it would be unfair not to address the issue.

Wickswat contends that the special verdict form is legally deficient because it prevented the jury from considering his bad faith and CPA claims. In particular, Wickswat argues that, under Washington law, a plaintiff is entitled to have a jury adjudicate its bad faith and CPA

claims, even though the jury finds on a separate breach of contract claim that the plaintiff intentionally misrepresented and/or concealed material facts during the claims process. He premises this contention on two theories: first, that a tort and/or statutory claim is independent from a breach of contract claim; and second, that an insurer is estopped from denying coverage, despite an insured's fraudulent misrepresentations, when it has also acted in bad faith. Safeco contends, in contrast, that the trial court gave the jury a proper verdict form based on the Washington Supreme Court's holding in *Cox*. We agree and hold that *Cox* is dispositive of the issue presented on appeal.

In *Cox*, defendant Cox purchased a homeowner's insurance policy from the plaintiff, Mutual of Enumclaw Insurance Company (MOE), which covered, among other things, his home and $137,000 worth of unscheduled personal property. A fire subsequently destroyed Cox's home and property. Cox submitted an itemized inventory of his unscheduled personal property. *Cox*, 110 Wn.2d at 645. The amount claimed for personal property, $324,420, substantially exceeded the amount of coverage. *Cox*, 110 Wn.2d at 645-46. During its investigation, MOE found no trace of certain items claimed lost. When confronted, Cox denied fraud but admitted making mistakes on the inventory list. MOE thereafter filed a declaratory judgment action, claiming that the policy was void because Cox had violated the policy's anti-fraud provision. *Cox*, 110 Wn.2d at 646. Cox counterclaimed that MOE had acted in bad faith and violated the CPA while processing his claim. *Cox*, 110 Wn.2d at 646-47.

At trial, the jury returned a verdict in favor of Cox, providing as follows on the special verdict form:

Question No. 1: Did the defendant commit fraud or false swearing regarding any matter relating to his insurance?

Answer: _X_ Yes ___ No

. . . .

Question No. 4: Is the insurance company estopped by its acts and conduct from voiding the insurance policies?

Answer: __X__ Yes _____ No

Question No. 5: Did the plaintiff insurance company act in bad faith in the handling of defendant's claim under the provisions of the Consumer Protection Act?

Answer: __X__ Yes _____ No

Question No. 6: Was such a violation a proximate cause of any damage sustained by the defendant?

Answer: __X__ Yes _____ No

Question No. 7: Did the plaintiff violate the provisions of the Washington Administrative Code?

Answer: __X__ Yes _____ No

Cox, 110 Wn.2d at 647-48.

On MOE's posttrial motion, the trial court granted a judgment n.o.v. to MOE, holding that Cox's fraud precluded his estoppel claim. *Mutual of Enumclaw Ins. Co. v. Cox*, 110 Wn.2d 643, 648, 757 P.2d 499 (1988). On direct review, the Supreme Court affirmed, holding that once the jury found fraud, it should have stopped its deliberations and not considered whether estoppel applied. *Cox*, 110 Wn.2d at 652. The court explained that Cox was not entitled to the benefit of estoppel because, given his attempt to defraud MOE, he did not have clean hands. *Cox*, 110 Wn.2d at 650-51. As to whether Cox was entitled to have a jury adjudicate his claim for bad faith under the CPA, the court stated:

> [T]he purpose of the CPA will not be served by awarding damages, attorney fees, and costs to Cox after he tried to perpetrate a fraud on MOE. Furthermore, legal mechanisms exist to punish insurers guilty of CPA violations since insurers are subject to the enforcement powers of the State Insurance Commissioner. We consider this regulation by the Insurance Commissioner to be an adequate deterrence against bad faith by insurance companies. We need not further punish MOE when to do so would provide a windfall to one guilty of fraud.
>
> . . . .
>
> The CPA exists to protect consumers, not to aid and abet

fraud. We hold that Cox is not entitled to recovery under the CPA.

*Cox*, 110 Wn.2d at 652-53.

■ The factual scenario provided in *Cox* is nearly identical to the present case. In particular, in both cases there was evidence that the insured attempted to defraud its insurer during the claims process. Accordingly, based on the clear holding in *Cox*, we find that the trial court in this case correctly directed the jury not to consider Wickswat's bad faith and CPA violation claims if it found that he intentionally misrepresented or concealed material facts during the claims process. Indeed, the trial court's verdict form reflects an approach consistent with *Cox*.

Attempting to persuade this court otherwise, Wickswat relies on a number of cases from other jurisdictions for the proposition that an insured's bad faith tort claim will survive a failed breach of contract claim.[4] The majority of those cases, however, fail to address the specific issue of whether an insured is entitled to bring a bad faith claim when there is a factual finding that he or she attempted to defraud the insurer. Moreover, even if those cases were to so hold, our supreme court appears to have made a policy choice not to permit an insured guilty of material fraud to sue an insurer for either a CPA violation or, implicitly, bad faith.

As for the Washington cases Wickswat relies on, *Safeco Ins. Co. v. Butler*, 118 Wn.2d 383, 823 P.2d 499 (1992) and *Ellis v. William Penn Life Assurance Co. of Am.*, 124 Wn.2d 1, 873 P.2d 1185 (1994), we find that they do not compel a different result. In *Butler*, nineteen-year-old Eddie Zenker and his two friends blew up Hap Butler's mailbox with firecrackers. Butler heard the explosion and chased the three young men in his car. When Butler

---

[4]*Deese v. State Farm Mut. Auto. Ins. Co.*, 172 Ariz. 504, 838 P.2d 1265 (1992); *McCoy v. Oklahoma Farm Bureau Mut. Ins. Co.*, 841 P.2d 568 (Okla. 1992); *Hatch v. State Farm Fire & Cas. Co.*, 842 P.2d 1089 (Wyo. 1992); *Viles v. Security Nat'l Ins. Co.*, 788 S.W.2d 566 (Tex. 1990); *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 510 P.2d 1032, 108 Cal. Rptr. 480 (1973).

caught up to them, he began shooting a gun, under circumstances that were disputed, and seriously injured Zenker. *Butler*, 118 Wn.2d at 386-87. Zenker subsequently filed a civil suit against Butler. Butler tendered his defense of the suit to Safeco Insurance Company. Safeco sought a declaratory judgment that Butler was not covered under his homeowners insurance policy. Two weeks later, Safeco notified Butler that it would provide a defense under the policy's reservation of right to contest coverage clause. *Butler*, 118 Wn.2d at 387.

The Zenkers and Butlers thereafter entered into a stipulated agreement and judgment regarding the amount of damages. *Butler*, 118 Wn.2d at 387. The Zenkers agreed to limit their efforts to satisfy the judgment to proceeds from the Safeco policy and/or any proceeds recovered from the Butlers' bad faith claim against Safeco. *Butler*, 118 Wn.2d at 387-88. The trial court granted summary judgment in favor of Safeco on the issue of coverage. Butler amended his answer, asserting that Safeco was estopped from denying coverage, but the trial court granted Safeco's motion for summary judgment on that issue as well. Finally, Butler again amended his answer, asserting a counterclaim against Safeco for bad faith in handling the claim. The trial court denied Safeco's motion for summary judgment on that claim. *Butler*, 118 Wn.2d at 388.

On review, the supreme court affirmed. In doing so, the court began by describing the "enhanced duty" that an insurer owes an insured when defending under a reservation of rights. The court stated that while the relationship between an insurer and insured is not a true fiduciary relationship, an insurer must nevertheless, in good faith, give equal consideration to the insured's interests. Butler, 118 Wn.2d at 388-90 (construing *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 715 P.2d 1133 (1986)). From this, the court went on to hold that, as a remedy, "where an insurer acts in bad faith in handling a claim under a reservation of rights, the insurer is estopped from denying coverage." *Butler*, 118 Wn.2d at 392.

Wickswat contends that, under *Butler*, he was entitled to have the jury consider his bad faith and CPA claims despite its no coverage finding. As Safeco argues, however, *Butler* does not control here for several reasons. First, the holding in *Butler* suggests that it is limited to those situations in which an insurer defends an insured's interests under a reservation of rights clause. Indeed, the court made clear that equitable estoppel is an appropriate remedy for an insurer's bad faith conduct in that context given the insurer's "enhanced obligation of fairness" toward the insured. *Butler*, 118 Wn.2d at 393. *See Planet Ins. Co. v. Wong*, 74 Wn. App. 905, 909, 877 P.2d 198 (citing *Butler* for the proposition that "[w]here an insurer acts in bad faith in handling a claim under a reservation of rights, the insurer is estopped from denying coverage"), *review denied*, 125 Wn.2d 1008 (1994). Second, *Butler* did not address the specific issue presented in *Cox*—namely, whether estoppel is an appropriate remedy for an insurer's bad faith conduct when the insured has engaged in fraud. The effect of an insured's fraud was simply not a factor considered by the court in *Butler*.

As for *Ellis*, it comes closer to the present case but is still distinguishable.[5] In *Ellis*, Strother purchased a group policy from Mutual Life Insurance Company of New York (MONY), which insured him against, among other things, mountain climbing. *Ellis*, 124 Wn.2d at 8. One year later, Strother purchased a life insurance policy from Capitol Bankers Insurance Company (Capitol Bankers). *Ellis*, 124 Wn.2d at 8-9. In his application, Strother failed to disclose his policy with MONY and misrepresented that he had not been mountain climbing within the last three years and that he did not intend the policy to replace another. *Ellis*, 124 Wn.2d at 9.

Capitol Bankers issued the new policy, which did not insure Strother against the risks of mountain climbing,

---

[5]*Ellis* involved two consolidated cases, *Ellis* and *Strother*. Because, however, *Strother* is factually more applicable, we address the court's opinion only in the context of that case.

but it failed to issue replacement insurance notices to Strother and MONY as required by the Washington Insurance Commissioner. *Ellis*, 124 Wn.2d at 9. Some time later, Strother died in a mountain climbing accident. Capitol Bankers refused to pay the beneficiary, Susan Strother, under the policy, claiming that Strother's material misrepresentations voided the policy. Susan filed suit against Capitol Bankers, claiming, among other things, equitable estoppel and violation of the public interest and CPA. *Ellis*, 124 Wn.2d at 10.

At trial, a jury found that the Capitol Bankers' representative who issued the policy to Strother knew or should have known that Strother intended to replace the MONY policy with the Capitol Bankers policy. From this, the trial court concluded that, based on public policy grounds, Capitol could not void the policy given its failure to comply with the statutory policy replacement notice requirements. The trial court rejected Susan's CPA claim, however, indicating that it was precluded by Strother's fraud. *Ellis*, 124 Wn.2d at 10. On appeal, a panel of this court affirmed the trial court's conclusion that Capitol Bankers violated the statutory notice requirements, but it reversed the trial court's conclusion that Capitol Bankers could not void the policy. In reversing, the court indicated that Strother's fraud not only precluded Susan's CPA claim, but her equitable estoppel claim as well. *Ellis*, 124 Wn.2d at 10-11.

On review, the supreme court reversed this court, distinguishing *Cox* and concluding that an insured's fraud does not necessarily preclude a party from asserting an equitable estoppel claim against an insurer who has also committed a wrongful act. In reaching this conclusion, the court relied on the public policy goal that would be served by allowing estoppel in the context of that case. Specifically, the court stated that allowing a party to assert estoppel against an insurance company in the context of replacement life insurance policies, despite an insured's attempted fraud, would further the public policy goal of protecting beneficiaries. *Ellis v. William Penn Life Assur-*

ance Co. of Am., 124 Wn.2d 1, 15-16, 873 P.2d 1185 (1994) (citing *Tannenbaum v. Provident Mut. Life Ins. Co. of Philadelphia*, 53 A.D.2d 86, 386 N.Y.S.2d 409 (1976), *aff'd*, 41 N.Y.2d 1087, 364 N.E.2d 1122, 396 N.Y.S.2d 351 (1977) and *Trainor v. John Hancock Mut. Life Ins. Co.*, 54 N.Y.2d 213, 429 N.E.2d 759, 445 N.Y.S.2d 81 (1981)). The court then set forth the test to be applied, indicating that if, on the one hand, the insurer's conduct is more egregious than the insured's conduct in causing harm to the beneficiary's interests, then the replacement insurer is estopped from denying liability for the face value of the *replacement* policy. If, on the other hand, the insurer and insured's conduct was equally egregious in causing harm to the beneficiary's interests, then the replacement insurer is estopped from denying liability for the face value of the *replaced* policy. *Ellis*, 124 Wn.2d at 16-17.

As Safeco contends, the supreme court did not intend for *Ellis* to overrule *Cox*. Rather, *Ellis* merely sets forth a limited exception to the "unclean hands" rule, which was applied in *Cox*, in the context of replacement life insurance. In particular, *Ellis* stands for the basic proposition that it would be unfair, in the context of replacement life insurance, to bar an innocent beneficiary from claiming the benefit of equitable estoppel when both the insurer and insured engaged in wrongful acts. The same fairness and policy considerations simply do not apply in either Cox or the present case where no third party beneficiary is involved.[6] We therefore reject Wickswat's claim of error and hold that the special verdict form was properly given under *Cox*.

The judgment is affirmed.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

---

[6]Even assuming that the rule in *Ellis* did apply in the context of this case, Wickswat would still not be entitled to claim estoppel given the comparative egregiousness of the parties' behavior. Specifically, while there is no question that Wickswat made a number of intentional misrepresentations during the claims process, the evidence of Safeco's wrongful conduct is slim at best.

BECKER and ELLINGTON, JJ., concur.

Review denied at 128 Wn.2d 1017 (1996).