IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JOEL JOHNSON, a single person, | ) | No. 68029-3-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| SAFECO INSURANCE COMPANY OF | ) | |
| AMERICA, an insurance company; | ) | |
| MOUNT VERNON FIRE INSURANCE | ) | |
| COMPANY, an insurance company, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondents, | ) | |
| | ) | |
| TAYLOR, BEAN & WHITAKER | ) | |
| MORTGAGE CORP., a Washington | ) | |
| corporation, | ) | |
| | ) | |
| Defendant. | ) | FILED: September 16, 2013 |

SCHINDLER, J. — Joel Johnson appeals summary judgment dismissal of his

claims against Safeco Insurance Co. and the order granting the CR 50 motion to

dismiss his bad faith claim and claims against Mount Vernon Fire Insurance Co. under

the Consumer Protection Act (CPA), chapter 19.86 RCW. We affirm.

FACTS

The material facts are not in dispute. Joel Johnson owned a house in Edmonds

located at 5703 145th Street Southwest and had a "Quality-Plus Homeowners Policy"

with Safeco Insurance Co. On July 22, 2008, Johnson refinanced the Edmonds house

with Taylor Bean & Whitaker Mortgage Corp. (TBW). TBW assumed responsibility for paying the insurance premium from the escrow account.

Johnson also owns rental property located at 9036-38 4th Avenue Southwest in Seattle. The rental property is a duplex with an upstairs unit of approximately 2,500 square feet and a small basement apartment of approximately 1,000 square feet. The mortgage payments for the rental property were $1,800 a month.

On September 28, 2008, Safeco sent TBW and Johnson a renewal notice for the upcoming 12-month policy period of November 17, 2008 to November 17, 2009. In October, TBW sent Safeco a check for the premium amount due to renew the policy. But TBW stopped payment on the check and did not reissue another check to pay for the premium.

On December 2, Safeco sent Johnson an expiration notice. The notice states that Safeco had not received the renewal premium from the mortgage company. The notice gave Johnson until January 5, 2009 to send Safeco the premium to "keep your policy in effect." Neither Johnson nor TBW paid the premium to renew the homeowners' insurance policy.

On January 11, 2009, Safeco sent a notice of cancellation to TBW stating that the mortgage company's interest in the policy would be cancelled on February 5. At some point after receipt of the notice of cancellation from Safeco, TBW obtained a "lender placed" homeowners' insurance policy for Johnson's house with Mount Vernon Fire Insurance Co. The policy was effective from November 17, 2008 to November 17, 2009.

On January 25, 2009, the chimney in Johnson's house caught fire. The fire

destroyed the house and personal property. Johnson moved into his rental property in Seattle.

When Johnson contacted Safeco, Safeco told him the policy expired because the premium was not paid. TBW informed Johnson that the Mount Vernon policy would cover the fire-related structure repairs, damaged personal property, and additional living expenses (ALE).

Johnson submitted a claim to Mount Vernon. Mount Vernon assigned Maureen Connor to process the claim. Mount Vernon also retained an independent local adjuster, Tony Brown. Brown inspected the property on February 6. On February 23, Brown submitted an estimate for the structural repairs of $133,041.30, plus an allowance for personal property. On February 25, Mount Vernon authorized payment for the full cost of repair. But after discovering the Safeco policy was in effect as to TBW, Mount Vernon cancelled payment. On April 27, Mount Vernon filed a claim with Safeco.

In early May, Johnson told Brown that he was living in his rental property and the rent was $1,800 a month. Johnson said that he moved into his unoccupied rental "to mitigate his exposure (ALE)."

On May 27, Connor informed Johnson that Mount Vernon needed documentation to support his ALE claim for $1,800 a month in rent. Johnson then sent a letter to Connor stating that "[t]he cost of the house I'm living in is $1,800 per month." In response, Connor told Johnson that "Mt. Vernon needed actual substantive documentation to support his claim."

Connor's supervisor James Ziff concluded that there was no coverage to

3

reimburse Johnson for lost rent. But when Ziff spoke to Johnson on May 29, Ziff agreed to pay five months of ALE at $1,250 per month. Ziff also agreed to a $5,000 advance for reimbursement of the personal property loss. In August, Johnson contacted Brown to request additional ALE. On September 21, Ziff told Johnson that he had 30 days to provide documentation to support his ALE claim or Mount Vernon would close the claim.

Safeco concluded that TBW was entitled to coverage for the structural damage to Johnson's house. In June, Safeco entered into an agreement with Mount Vernon to pay 51 percent of the structural repair costs. On June 20, Safeco paid its share of its estimate of the actual cash value of the structure.

Mount Vernon asked an independent adjuster to review Safeco's estimate of the structural repair costs. In October, Mount Vernon paid its share of the structure repair cost based on its own estimate.[1] Mount Vernon then closed the claim because Johnson did not submit an inventory of personal property or any documentation to support his ALE claim.

On November 25, an attorney representing Johnson sent a letter to Mount Vernon demanding payment of $18,000 for ALE. The attorney provided Mount Vernon with a lease agreement between Johnson and his previous renters Pete and Evon Little. According to the terms of the lease, the Littles rented the upstairs of the duplex from May 15, 2008 to November 15, 2008 for $1,800 a month. Mount Vernon denied ALE coverage on the grounds that the policy did not cover lost rent.

On December 18, Johnson notified Mount Vernon that he planned to file a claim under the Insurance Fair Conduct Act, chapter 48.30 RCW, for unreasonable denial or

---

[1] On February 9, 2011, Mount Vernon issued its final payment for the cost of the repairs in the amount of $33,949.40.

delay for ALE payments. Mount Vernon agreed to pay Johnson an additional $1,250 a month for the previous six months.

On May 24, 2010, Johnson filed a lawsuit against Safeco, Mount Vernon, and TBW. Johnson alleged Safeco breached the terms of the insurance policy by failing to provide proper notice to Johnson before cancellation, and refusing to pay him for the structural costs of repair, personal property damage, and ALE. Johnson alleged TBW had a contractual duty "to properly and timely make his insurance payments to avoid any cancellation of his insurance policy" with Safeco. Johnson alleged Mount Vernon breached its contractual duty to pay for the cost of structural repairs, personal property damage, and living expenses. Johnson alleged Mount Vernon also failed "to conduct a reasonable investigation of the fire loss, and fail[ed] to provide for the timely repair and/or rebuilt of his dwelling to its original pre-loss condition with like, kind, and quality materials and professional workmanship."

Johnson also alleged that Safeco and Mount Vernon violated the insurance regulatory provisions of the Washington Administrative Code (WAC); violated the Consumer Protection Act (CPA), chapter 19.86 RCW, and the Insurance Fair Conduct Act, chapter 48.30 RCW; and breached the duty of good faith and fair dealing. After TBW filed for bankruptcy, Johnson voluntarily dismissed TBW without prejudice.

Safeco filed a motion for summary judgment arguing that because Johnson did not pay the premium, the homeowners' policy expired before the fire on January 25, 2009. The court granted the motion for summary judgment. The court ruled, in pertinent part:

> The relevant law here that has to do with renewal of a policy or a cancellation. Either way, Safeco's properly met its obligations here. The

5

notices were sent. Mr. Johnson didn't renew the policy.

I recognize that it may have been the responsibility of [TBW] to do that, but nevertheless, it's not Safeco's fault that the policy wasn't renewed and therefore, Safeco doesn't have any liability here.

The trial on the claims against Mount Vernon was scheduled to begin on October 3, 2011. On August 18, Johnson filed a motion for summary judgment on the breach of contract claim for ALE. Johnson argued that he was entitled to lost rental income of $1,800 a month.

On August 31, Mount Vernon took Johnson's deposition. Johnson testified that Dean Little signed the lease on May 15, 2008 and the Littles rented the upstairs portion of the duplex for $1,800 a month from May 2008 to December 2008. But Johnson later admitted that he had forged the lease and asserted the lease reflected the oral agreement he had with the Littles. Mount Vernon filed an amended answer asserting misrepresentation and fraud as an affirmative defense.

Mount Vernon filed a motion for entry of a judgment as a matter of law to dismiss. In support, Mount Vernon filed the affidavit of Dean Little. Little states that he and his spouse rented the basement apartment of Johnson's duplex from May 2008 to March 2009 for $750 a month, and they did not sign a lease.

On the first day of the scheduled trial, the court granted the CR 50 motion for judgment as a matter of law. The court ruled that "following plaintiff's factual admissions, no legally sufficient basis exists for a jury to find for the plaintiff on his contractual, extra-contractual or CPA claim." The order sets forth in detail the undisputed facts establishing Johnson intentionally misrepresented the terms of the rental agreement that was submitted to obtain ALE. The undisputed findings state, in

6

pertinent part:

     2.    Mt. Vernon's insurance policy issued to plaintiff contains a clause stating that it provides coverage to no "insureds" if the insured has committed fraud, concealment or misrepresentation of any material fact related to the insurance. (Homeowners 3, condition Q) . . . .

     3.    In May 2009, plaintiff submitted a letter to Mt. Vernon requesting that he be paid $1,800 per month in additional living expenses ("ALE").

     4.    In November 2009, plaintiff submitted a document entitled "Rental Agreement" to Mount Vernon as evidence in support of his claim for $1,800 per month in ALE under Mount Vernon's policy.

     5.    The Rental Agreement states that plaintiff rented a residence to Pete and Evon Little, for a period of six months, beginning May 15, 2008, at a rate of $1,800 per month; the Rental Agreement purports to contain the signatures of plaintiff and Pete Little.

     6.    In January 2010, Mt Vernon paid plaintiff additional ALE after this Rental Agreement was submitted to it. Plaintiff subsequently filed suit against Mt. Vernon for further ALE and under various theories of extra-contractual liability.

     7.    Plaintiff testified under oath at his deposition that (a) the Rental Agreement was a genuine written agreement between him and Pete and Evon Little, (b) it related to the upper, larger portion of a duplex, specifically, 9036 4th Avenue Southwest, in Seattle, (c) it was signed by Pete Little on May 15, 2008, and (d) that the terms and conditions recited therein were the actual terms and conditions of the agreement he had with Pete and Evon Little.

     8.    Whether plaintiff is entitled to ALE in addition to that which was paid prior to litigation has been at issue in this case since the beginning.

     9.    The Rental Agreement is a blank legal form which was filled in by plaintiff. The legal form in question did not exist on its purported May 15, 2008 date of execution as one of the pages of the Rental Agreement was not available for sale to the public until 2009. The Rental Agreement cannot be a genuine agreement between plaintiff and Pete and Evon Little.

     10.    After being confronted with this evidence, plaintiff conceded that he had fabricated the document. However, he asserted that irrespective of the fabrication, he actually had an oral lease with Pete and Evon Little for the terms and conditions set forth in the Rental Agreement. Specifically, he contended that he had rented the upper part of the duplex, 9036 4th Avenue Southwest, Seattle, to Pete arid Evon Little from May 15, 2008 to some time in December, 2008 for the amount of $1,800 per month.

     11.    On September 30, 2011, plaintiff's counsel notified Mt. Vernon's counsel that plaintiff had discovered a box containing the true

7

names of his renters, which was evidence that they rented from plaintiff. Plaintiff's counsel revealed to Mt. Vernon's counsel, however, that the true names of the renters were Dean Little and Yvonne Mokihana Calizar. On October 2, 2011, Mt. Vernon's counsel was able to locate Mr. Little and Ms. Calizar.

12. Dean Little is also known as Pete Little. Mr. Little testified in an affidavit that he and his wife did rent property from plaintiff, but (a) they rented the downstairs apartment at 9038 4th Avenue Southwest, Seattle, and not the upstairs with the address 9036 4th Avenue Southwest, Seattle; (b) they paid plaintiff $750 per month, not $1,800 per month; (c) they never signed a rental agreement; (d) they lived in the basement apartment from May of 2008 to March of 2009.

13. Plaintiff has not disputed any of the foregoing evidence, and in pleadings filed with the Court, plaintiff's counsel concedes the foregoing evidence.

The court concluded there was no genuine issue of fact for trial, and under the

"controlling case law authority, Mutual of Enumclaw Ins. Co. v. Cox, 110 Wn.2d 643[,

757 P.2d 499] (1988) and Onyon v. Truck Ins. Exch., 859 F.Supp. 1338 (W.D. Wash.

1994); [and] Kim v. Allstate[ Ins. Co., 153 Wn. App. 339, 223 P.3d 1180 (2009)],"

(1) an insured who makes a material misrepresentation of fact relating to his claim under a policy of insurance that contains a clause voiding specific coverage entirely for the insured's fraud or misrepresentation, is precluded from recovery on that coverage insurance policy;

(2) an insured who makes a material misrepresentation of fact relating to his insurance claim is precluded from maintaining tort causes of action such as bad faith and violation of the Consumer Protection Act.

The court dismissed Johnson's complaint against Mount Vernon with prejudice

because he "intentionally misrepresented material facts concerning his insurance claim

with Mt. Vernon. [Johnson] is precluded from making any recovery from Mount Vernon

by established law."[2]

---

[2] The court granted Mount Vernon's motion for sanctions under CR 11 and ordered Johnson to pay $22,500 in attorney fees and costs.

ANALYSIS

Summary Judgment Dismissal of Claims Against Safeco

Johnson contends the court erred in dismissing his claims against Safeco for breach of the insurance contract, bad faith, and violation of the CPA.

When review summary judgment de novo. Wilson v. Steinbach, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is appropriate

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

CR 56(c); White v. State, 131 Wn.2d 1, 9, 929 P.2d 396 (1997).

The interpretation of an insurance contract is a question of law that we also review de novo. Bushnell v. Medico Ins. Co., 159 Wn. App. 874, 881, 246 P.3d 856 (2011). We construe insurance policies in the same manner as contracts. Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wn.2d 654, 665-66, 15 P.3d 115 (2000). In determining the legal effect of a contract, "a court must construe the entire contract together so as to give force and effect to each clause." Pub. Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co., 124 Wn.2d 789, 797, 881 P.2d 1020 (1994); Quadrant Corp. v. Am. States Ins. Co., 154 Wn.2d 165, 171, 110 P.3d 733 (2005) (principles of contract interpretation apply to insurance policies). If the language in an insurance contract is unambiguous, the court must enforce it as written and may not modify the contract or create an ambiguity where none exists. State Farm Mut. Auto. Ins. Co. v. Ruiz, 134 Wn.2d 713, 721, 952 P.2d 157 (1998).

Johnson contends the insurance policy for the 12-month period beginning November 17, 2008 became effective when Safeco sent him a copy of the renewal

policy on September 28, 2008. But the renewal notice and express terms of the policy require payment of the premium in order to renew the policy. The September 28 renewal notice states:

> [I]t is now time to renew your Quality-Plus Homeowners policy. . . . Your new policy period begins November 17, 2008. The 12-month premium for this policy is $630.00 for the November 17, 2008 to November 17, 2009 policy term. . . . We have sent a bill for this amount to your mortgage servicing company.

The Safeco homeowners' insurance policy only applies to a loss that occurs during the policy period, and the policy may be renewed "for successive policy periods if the required premium is paid." The policy provides, in pertinent part:

> SECTION I AND II — PROPERTY AND LIABILITY CONDITIONS
> 1. Policy Period and Changes.
>    a. The effective time of this policy is 12:01 A.M. at the *residence premises*. This policy applies only to loss under Section I, or *bodily injury* or *property damage* under Section II, which occurs during the policy period. This policy may be renewed for successive policy periods if the required premium is paid and accepted by us on or before the expiration of the current policy period. The premium will be computed at our then current rate for coverage then offered.
>    b. Changes:
>       (1) Before the end of any policy period, we may offer to change the coverage provided in this policy. Payment of the premium billed by us for the next policy period will be your acceptance of our offer.
>       (2) This policy contains all agreements between you and us. Its terms may not be changed or waived except by endorsement issued by us.

The policy also provided that Safeco would pay claims and provide coverage only if the premiums were paid when due:

> INSURING AGREEMENT
> In reliance on the information you have given us, we will pay claims and provide coverage as described in this policy if you pay the premiums when due and comply with all the applicable provisions outlined in this policy.

The plain and unambiguous language of the policy requires payment of the premium in order to renew the policy.

Further, the cases Johnson cites do not support the argument that the Safeco policy automatically renewed when Safeco sent him a copy of the policy. In Frye v. Prudential Insurance Co. of America, 157 Wash. 88, 95, 288 P. 262 (1930), the court addressed whether an insurance company was estopped from claiming the policy had expired for late payment when the insurer has a pattern of allowing the insured to make late payments. See also McGreevy v. Or. Mut. Ins. Co., 74 Wn. App. 858, 867, 876 P.2d 463 (1994) (amendments to insurance policy not effective where insured had no notice of the changes); Webster v. State Farm Mut. Auto. Ins. Co., 54 Wn. App. 492, 496, 774 P.2d 50 (1989) (no dispute that policy had been issued).

In the alternative, Johnson claims that mailing the renewal policy to him was an offer followed by acceptance when TBW sent payment of the premium to Safeco. Acceptance of an offer must be identical to the offer or no contract is formed. Sea-Van Invs. Assocs. v. Hamilton, 125 Wn.2d 120, 126, 881 P.2d 1035 (1994). The plain language of the policy required payment of the premium. Because there is no dispute TBW stopped payment and Johnson never paid the premium, the homeowners' policy was not renewed or in effect at the time of the fire.[3]

Johnson also contends Safeco did not comply with either the policy or the statutory notice requirements. Safeco asserts that because Johnson did not pay the premium to renew the policy, it did not have an obligation to send a cancellation notice.

---

[3] "[I]n the absence of a restrictive statutory provision, the insurer and insured have the right to specify in their insurance contract the method by which it can be terminated." Taxter v. Safeco Ins. Co. of Am., 44 Wn. App. 121, 127, 721 P.2d 972 (1986).

But Safeco also asserts the December 2, 2008 notice of expiration complied with the requirement to provide notice of cancellation. We agree with Safeco.

In Safeco Insurance Co. v. Irish, 37 Wn. App. 554, 681 P.2d 1294 (1984), we held that the cancellation provisions of an insurance policy did not apply to the failure to pay a renewal premium.

> Unfortunately, the issue before us was brought about in great measure because of the form chosen by Safeco to notify Irish that he had an extended period of time in which to reinstate coverage under his lapsed policy. Although denominated a "cancellation" notice, it was, in fact, merely a reminder that (1) Irish had not accepted Safeco's offer to renew, (2) his policy had lapsed, and (3) he was being given an opportunity to reinstate.
> The term "cancellation" refers to a unilateral act of the insurer terminating coverage during the policy term. . . . Neither RCW 48.18.291, relied upon by Irish, nor his policy provisions governing cancellation apply to a situation where the insured fails to pay a premium as a condition to renewal. . . . Thus, the general rule is that failure of an insured to pay a renewal premium by the due date results in a lapse of coverage as of the last day of the policy period.

Irish, 37 Wn. App. at 557-58.

Here, as in Irish, Safeco did not cancel the policy during the policy period. Safeco sent a notice offering to renew the policy upon payment of the premium.[4] Johnson's policy coverage expired because he did not pay the renewal premium. Safeco notified Johnson on September 28, 2008 that his policy would be renewed only if he paid the premium by November 17, 2008. The unambiguous language in the policy states that the policy would renew for a successive period if payment was made on time: "This policy may be renewed for successive policy periods if the required premium is paid and accepted by us on or before the expiration of the current policy period."

---

[4] Accordingly, the policy provision that requires Safeco to give 31 days notice if Safeco elects not to renew the policy does not apply.

On December 2, 2008, Safeco notified Johnson again stating that the premium was past due and the policy had expired, but gave him until January 5, 2009 to pay the premium and "keep your policy in effect." The "HOMEOWNERS EXPIRATION NOTICE (for non-payment of premium)" sent to Johnson on December 2 states:

> [A]s of December 1, 2008, we have not yet received your renewal premium of $630.00 from your mortgage company. This payment was due on November 17, 2008. Your Homeowners policy expired at 12:01 a.m. standard time on November 17, 2008.
> Fortunately, we can continue your policy, with no lapse in coverage, if you send your payment to us postmarked no later than January 5, 2009. We urge you to contact your mortgage company to ensure that payment is sent in time to keep your policy in effect.

The December 2, 2008 notice complied with the requirements under the policy to provide notice "at least 20 days before the date cancellation takes effect"[5] and the 10-day notice required by RCW 48.18.290(1)(c).

The policy states, "When you have not paid the premium we may cancel at any time by notifying you at least 20 days before the date cancellation takes effect." RCW 48.18.290(1)(c) requires an insurer cancelling a policy for nonpayment of premium to

---

[5] The policy states, in pertinent part:
Cancellation.
. . . .
    (1)    When you have not paid the premium we may cancel at any time by notifying you at least 20 days before the date cancellation takes effect.
. . . .
Non-Renewal. We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 31 days before the expiration date of this policy. Proof of mailing shall be sufficient proof of notice.

send notice at least 10 days before the effective cancellation date.[6]

Johnson claims he did not receive the December 2 notice. The unrebutted evidence establishes Safeco mailed the December 2 notice to Johnson. Under the policy and RCW 48.18.293(2), proof of mailing is proof of notice. See also Trinity Universal Ins. Co. v. Willrich, 13 Wn.2d 263, 273, 124 P.2d 950 (1942) (holding policy provision providing that mailing of notices was proof of notice is enforceable); Sowa v. Nat'l Indem. Co., 102 Wn.2d 571, 580, 688 P.2d 865 (1984) (insurer had to prove policy endorsements were sent, not that they were received); Kaiser Aluminum & Chem. Corp. v. Dep't of Labor & Indus., 57 Wn. App. 886, 889-90, 790 P.2d 1254 (1990).

---

[6] RCW 48.18.290 states, in pertinent part:

(1) Cancellation by the insurer of any policy which by its terms is cancellable at the option of the insurer, or of any binder based on such policy which does not contain a clearly stated expiration date, may be effected as to any interest only upon compliance with the following:

    (a) For all insurance policies other than medical malpractice insurance policies or fire insurance policies canceled under RCW 48.53.040:

    (i) The insurer must deliver or mail written notice of cancellation to the named insured at least forty-five days before the effective date of the cancellation; and

    (ii) The cancellation notice must include the insurer's actual reason for canceling the policy.

. . . .

    (c) If an insurer cancels a policy described under (a) or (b) of this subsection for nonpayment of premium, the insurer must deliver or mail the cancellation notice to the named insured at least ten days before the effective date of the cancellation.

    (d) If an insurer cancels a fire insurance policy under RCW 48.53.040, the insurer must deliver or mail the cancellation notice to the named insured at least five days before the effective date of the cancellation.

    (e) Like notice must also be so delivered or mailed to each mortgagee, pledgee, or other person shown by the policy to have an interest in any loss which may occur thereunder. For purposes of this subsection (1)(e), "delivered" includes electronic transmittal, facsimile, or personal delivery.

(2) The mailing of any such notice shall be effected by depositing it in a sealed envelope, directed to the addressee at his or her last address as known to the insurer or as shown by the insurer's records, with proper prepaid postage affixed, in a letter depository of the United States post office. The insurer shall retain in its records any such item so mailed, together with its envelope, which was returned by the post office upon failure to find, or deliver the mailing to, the addressee.

(3) The affidavit of the individual making or supervising such a mailing, shall constitute prima facie evidence of such facts of the mailing as are therein affirmed.

Next, Johnson claims that because Safeco did not properly notify TBW, the policy was in effect as to <u>both</u> TBW and himself on January 25, 2009. We disagree.

Under the terms of the policy, TBW had a separate interest.[7] The policy declaration identified Johnson as the insured and TBW as the "mortgagee." The policy specifically provides additional protection to the mortgagee that requires notification before cancellation or renewal. The policy states, in pertinent part:

> Mortgage Clause.
> . . . If mortgagee is named in this policy, any loss payable under Coverage A or B shall be paid to the mortgagee and you, as interests appear. . . .
> If we deny your claim, that denial shall not apply to a valid claim of the mortgagee, if the mortgagee:
> a.    notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;
> b.    pays any premium due under this policy on demand if you have neglected to pay the premium;
> . . . .
> . . . If the policy is canceled or not renewed by us, the mortgagee shall be notified at least 20 days before the date cancellation or nonrenewal takes effect.

Consistent with the terms of the policy, on January 11, 2009, Safeco sent TBW a notice of cancellation. The notice states:

> We are cancelling this policy for nonpayment of premium. <u>Your</u> interest in this policy is cancelled. Coverage will end at 12:01 a.m. standard time on February 5, 2009.[8]

The court did not err in granting the summary judgment dismissal of the claims against Safeco. [9]

---

[7] In a statement of additional authority, Safeco also cites <u>Wisniewski v. State Farm General Insurance Co.</u>, 25 Wn. App. 766, 609 P.2d 456 (1980). In <u>Wisniewski</u>, the insurance company provided notice of cancellation to the homeowners but not to the lien holder. <u>Wisniewski</u>, 25 Wn. App. at 769. The court held that the cancellation was effective as to only the homeowners. <u>Wisniewski</u>, 25 Wn. App. at 769.

[8] (Emphasis added.)

[9] For the first time in his reply brief, Johnson attempts to argue the renewal and cancellation provisions are ambiguous. <u>Cowiche Canyon Conservancy v. Bosley</u>, 118 Wn.2d 801, 809, 828 P.2d 549, 553 (1992) (issue raised for the first time in a reply brief is too late to warrant consideration).

CR 50 Judgment as a Matter of Law

Johnson contends the trial court erred in granting the CR 50 motion for judgment as a matter law. Johnson alleged Mount Vernon breached the duty "to pay for fire related repairs, personal property damage, and additional living expenses" in violation of the WAC and the CPA.

Johnson does not challenge dismissal of his contract claims. Nor can he. It is well established that if the insured commits fraud with the intent of deceiving the insurance company, the insured forfeits any claim under the policy. Cox, 110 Wn.2d at 652-53; see also William E. Shipley, Annotation, Overvaluation In Proof of Loss of Property Insured As Fraud Avoiding Fire Insurance Policy, 16 A.L.R.3D 774, § 2 (1967). Accordingly, the Mount Vernon policy expressly states, in pertinent part:

> Q. Concealment Or Fraud
> We provide coverage to no "insureds" under this policy if, whether before or after a loss, an "insured" has:
> 1. Intentionally concealed or misrepresented any material fact or circumstance;
> 2. Engaged in fraudulent conduct; or
> 3. Made false statements;
> relating to this claim.

Nonetheless, Johnson asserts the court erred in dismissing his bad faith and CPA claims because his fraud occurred after Mount Vernon committed the alleged bad faith and violated the CPA. Mount Vernon asserts the Washington Supreme Court's decision in Cox is dispositive. We agree with Mount Vernon.

We review a CR 50 motion for judgment as a matter of law de novo. Goodman v. Goodman, 128 Wn.2d 366, 371, 907 P.2d 290 (1995). The decision to grant a motion for judgment as a matter of law is appropriate when, viewing the evidence most favorable to the nonmoving party, the court can say as a matter of law that there is no

substantial evidence or reasonable inference to sustain a verdict for the nonmoving party. Guijosa v. Wal-Mart Stores, Inc., 144 Wn.2d 907, 915, 32 P.3d 250 (2001).

Johnson does not challenge any of the undisputed and extensive findings of fact set forth in the "Order Granting Defendant Mount Vernon's Motion for Judgment as a Matter of Law." The undisputed findings establish he intentionally misrepresented material facts during the course of his claim with Mount Vernon by submitting a fraudulent lease "in order to obtain ALE benefits under the Mt. Vernon policy."

In Cox, the insured purchased a homeowners' policy from Mutual of Enumclaw (MOE) that provided coverage for his home and $137,000 in unscheduled personal property. Cox, 110 Wn.2d at 645. The policy contained a provision stating that the entire policy was void if an insured willfully concealed or misrepresented any material fact or circumstance. Cox, 110 Wn.2d at 646.

A fire destroyed the house and its contents. Cox, 110 Wn.2d at 645. The insured Cox submitted an itemized inventory in the amount of $324,420 for personal property destroyed by the fire. Cox, 110 Wn.2d at 645. MOE "found no trace of certain items claimed lost," including jewelry and bronze statutes valued at $35,000 to $40,000. Cox, 110 Wn.2d at 646.

MOE filed a declaratory judgment action asserting that under the terms of the policy, the fraudulent claim voided coverage. Cox, 110 Wn.2d at 646. Cox filed a counterclaim alleging MOE committed bad faith and unfair and deceptive practices while processing his claim in violation of the WAC and the CPA. Cox, 110 Wn.2d at 646-47.

The jury found in favor of Cox. In the special interrogatories, the jury found that

17

Cox committed fraud but that MOE was "estopped by its acts and conduct from voiding the insurance policies," and that MOE "act[ed] in bad faith in the handling of defendant's claim under the provisions of the Consumer Protection Act" and the WAC. Cox, 110 Wn.2d at 647-48. The trial court granted MOE's motion for judgment notwithstanding the verdict. Cox, 110 Wn.2d at 648. The trial court ruled that Cox's fraud precluded the use of estoppel. Cox, 110 Wn.2d at 648.

The Washington Supreme Court affirmed. Cox, 110 Wn.2d at 654. The Court held that the insured was not entitled to assert estoppel and that after finding that the insured committed fraud, the jury should not have considered the claims that MOE committed bad faith, violated the WAC, and violated the CPA. Cox, 110 Wn.2d at 652.

The Court held that where the insured intentionally misrepresents material facts during the claims process, the insured is not entitled to pursue bad faith or CPA claims. Cox, 110 Wn.2d at 652-53. In rejecting the insured's argument that the finding of fraud should not preclude his bad faith and CPA claims, the court states that the insured's fraud precludes any actions for bad faith or violation of the CPA. Cox, 110 Wn.2d at 652-53.

> [T]he purpose of the CPA will not be served by awarding damages, attorney fees, and costs to Cox after he tried to perpetrate a fraud on MOE. Furthermore, legal mechanisms exist to punish insurers guilty of CPA violations since insurers are subject to the enforcement powers of the State Insurance Commissioner. We consider this regulation by the Insurance Commissioner to be an adequate deterrence against bad faith by insurance companies. We need not further punish MOE when to do so would provide a windfall to one guilty of fraud.
> . . . .
> The CPA exists to protect consumers, not to aid and abet fraud.
> We hold that Cox is not entitled to recovery under the CPA.

Cox, 110 Wn.2d at 652-53.

18

Here, because there is no dispute that Johnson committed fraud during the claim process, he is not entitled to pursue the bad faith and CPA claims against Mount Vernon. See also Tornetta v. Allstate Ins. Co., 94 Wn. App. 803, 806-07, 810, 973 P.2d 8 (1999) (where the insured misrepresented the value of the jewelry and falsified a receipt from the jewelry store but alleged the insurance company committed bad faith and violated the CPA during the investigation of his claim for the allegedly stolen items, the court held that a plaintiff who commits fraud may not "pursue a bad faith or CPA claim"); Kim, 153 Wn. App. at 361 (insured's material misrepresentations "negate a finding that Allstate acted in bad faith or in violation of the CPA"); and Wickswat v. Safeco Ins. Co., 78 Wn. App. 958, 971, 904 P.2d 767 (1995) (where the insured intentionally misrepresented material facts during the claims process, under Cox, the insured is not entitled to sue the insurer for bad faith or violation of the CPA).

Strother v. Capitol Bankers Life Insurance Co., 68 Wn. App. 224, 842 P.2d 504 (1992), and Ellis v. William Penn Life Assurance Co. of America, 124 Wn.2d 1, 873 P.2d 1185 (1994), do not support Johnson's argument that despite his fraud, he is entitled to pursue the bad faith and CPA claims.

In Ellis, the Supreme Court consolidated and considered two cases, Ellis and Strother. Ellis, 124 Wn.2d at 3. The Court distinguished Cox and held that in the context of a replacement life insurance policy, the insured's fraud does not prevent an innocent beneficiary from asserting equitable estoppel against an insurer who has acted in bad faith. Ellis, 124 Wn.2d at 14. Ellis stands for the proposition that in the context of replacement life insurance, it would be unfair to bar an innocent beneficiary from relying on equitable estoppel where both the insurer and insured engaged in wrongful acts.

19

See Wickswat, 78 Wn. App. at 975.  But the same fairness and policy considerations do not apply in either Cox or here where no third party beneficiary is involved.  See Wickswat, 78 Wn. App. at 975.

Johnson's reliance on Oregon Mutual Insurance Co. v. Barton, 109 Wn. App. 405, 36 P.3d 1065 (2001), is also misplaced.  In Barton, the court addressed whether a settlement between an insurer and the insured was enforceable.  The insurance company attempted to void the policy after the settlement, claiming the insured had made material misrepresentations.  Barton, 109 Wn. App. at 411.  The court concluded the alleged misrepresentations could not have induced the settlement because the misrepresentations occurred after the settlement.  Barton, 109 Wn. App. at 416.

We conclude the trial court did not err in granting Mount Vernon's motion for judgment as a matter of law.

We affirm dismissal of Johnson's lawsuit against Safeco and Mount Vernon.

WE CONCUR:

20