# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

COURT OF APPEALS DIV 1
STATE OF WASHINGTON

FILED

2017 MAR 20 AM 8:39

|  |  |
|---|---|
| CAMBRIDGE DECISION SCIENCE, | No. 74774-6-I |
| Respondent, | DIVISION ONE |
| v. | |
| JON MARKMAN and ELLEN MARKMAN, and their marital community, | |
| Appellants. | |

|  |  |
|---|---|
| MARKMAN CAPITAL INSIGHT LLC., a Washington limited liability company, | UNPUBLISHED |
| Appellant, | FILED: March 20, 2017 |
| v. | |
| TREYTON THOMAS, aka TRAY THOMAS, aka TRACY LEE THOMAS, an individual, | |
| Third Party Defendant, | |
| and | |
| CAMBRIDGE DECISION SCIENCE, a foreign entity or trade name of Treyton Thomas; and TREADSTONE, a foreign entity or trade name of Treyton Thomas, | |
| Respondents. | |

COX, J. — Objective manifestation of mutual assent to all material terms of an agreement is an essential element to the valid formation of a legally enforceable contract.[1] Here, there was no such objective manifestation of mutual assent to the proposed settlement agreement. Moreover, the mutual release, which was conditioned on the existence of a legally enforceable contract, is not effective. We reverse.

This is an action to enforce an alleged settlement agreement and mutual release between Jon Markman, Tray Thomas, and their respective companies. Jon Markman is president of Markman Capital Insight LLC (MCI). Thomas conducted business as Cambridge Decision Science (CDS). Markman, Thomas, and their respective companies, had a business known as Gemini. MCI terminated this business relationship. Thomas and Markman then began settlement negotiations that led to this action.

Thomas transmitted to Markman a proposed settlement agreement dated October 15, 2015 together with a proposed mutual release of the same date. Among the terms of this proposal was paragraph 3 of the proposed settlement agreement regarding certain customer lists. Markman struck a portion of that paragraph 3 and initialed his correction. He then returned the modified document containing his rejection of the terms of paragraph 3 together with an explanatory e-mail containing a counteroffer: the stricken language would remain out of the settlement.

---

[1] P.E. Sys., LLC v. CPI Corp., 176 Wn.2d 198, 209, 289 P.3d 638 (2012).

Thomas and Markman exchanged further e-mails over the course of the next few days. These exchanges included Thomas making several counteroffers regarding the customer list described in paragraph 3 of the proposed settlement agreement.

There was also a proposal for arbitration of disputes that both sides never simultaneously agreed to. Specifically, on October 19, 2015, Markman wrote: "Let's go to binding arbitration. . . ."[2] Thomas responded: [U]pon examining binding arbitration thoroughly, we would not agree to it. . . . We have an existing executed Settlement Agreement and Mutual Release making arbitration pointless. . . ."[3]

Thereafter, CDS commenced this action for damages against MCI, Jon Markman, his wife, and their marital community. The complaint alleged that the parties entered into a binding settlement agreement, which Markman and his related company had breached. CDS sought $95,000, the payment amount under the terms of the agreement. MCI asserted a counterclaim and commenced a third party action against other parties to the alleged settlement agreement.

CDS then moved to enforce the settlement agreement. The trial court granted the motion without oral argument. It also dismissed MCI's third party claim and counterclaim. The trial court later denied the motion for reconsideration and entered a judgment in favor of CDS.

---

[2] Clerk's Papers at 171, 194.

[3] Id. at 197.

3

Jon Markman, Ellen Markman, and MCI appeal.

## SETTLEMENT AGREEMENT

Markman, his wife, and MCI argue that the settlement agreement dated October 15, 2015 is not an enforceable contract. Because there is no objective manifestation of mutual assent of the parties to all material terms of the alleged agreement, we agree.

Courts follow summary judgment procedures when a party moving to enforce a settlement agreement relies on affidavits or declarations to show that the agreement is not genuinely disputed.[4] The moving party must prove "'there is no genuine dispute over the existence and material terms of the agreement.'"[5] If the moving party satisfies this burden, the nonmoving party must produce evidence to show a genuine issue of material fact.[6] Courts must read the parties' submissions in the light most favorable to the nonmoving party to determine whether reasonable minds could reach only one conclusion.[7]

We review de novo the trial court's enforcement order because the proceeding is similar to a summary judgment proceeding.[8] If the nonmoving party raises a genuine issue of material fact, a trial court should not enforce a

---

[4] Condon v. Condon, 177 Wn.2d 150, 161, 298 P.3d 86 (2013).

[5] Id. at 162 (quoting Brinkerhoff v. Campbell, 99 Wn. App. 692, 696-97, 994 P.2d 911 (2000)).

[6] See id. at 161-62 n.4.

[7] Id. at 162.

[8] Id.

settlement agreement without first holding an evidentiary hearing to resolve the disputed issues of fact.[9]

*Objective Manifestation of Mutual Assent*

The threshold question is whether there is objective manifestation of mutual assent by the parties to all material terms between and among them. We conclude there is not.

We apply the common law of contracts to settlement agreements.[10] The parties' objective manifestation of mutual assent to all of an agreement's material terms is an essential element to the valid formation of a contract.[11] Generally, manifestations of mutual assent are expressed by an offer and an acceptance of that offer.[12]

Mutual assent is generally a question of fact, but it may be determined as a matter of law if reasonable minds could not differ.[13] The party asserting the contract's existence bears the burden of proving the existence of a mutual intention.[14]

---

[9] Id. at 161-62 n.4.

[10] See id. at 162.

[11] CPI Corp., 176 Wn.2d at 209.

[12] Keystone Land & Dev. Co. v. Xerox Corp., 152 Wn.2d 171, 178, 94 P.3d 945 (2004).

[13] CPI Corp., 176 Wn.2d at 207.

[14] Becker v. Wash. State Univ., 165 Wn. App. 235, 246, 266 P.3d 893 (2011).

No contract is formed unless acceptance of an offer is identical to the offer.[15] "Acceptance is an expression (communicated by word, sign, or writing to the person making the offer) of the intention to be bound by the offer's terms."[16] A party's expression of assent that changes the offer's terms "'in any material respect'" may be "'a counteroffer; but it is not an acceptance and consummates no contract.'"[17]

A material variance is fact dependent.[18] "Material" is defined as significant or essential.[19]

Here, the issue is whether Markman and Thomas, on behalf of themselves and others, objectively manifested that they agreed to all material terms of the proposed settlement agreement. We conclude that there was not such objective manifestation of mutual assent.

Thomas proposed a written settlement agreement and mutual release. In relevant part, paragraph 3 of the settlement agreement states:

> Markman has previously provided Thomas on May 7, 2015 with a copy of the Gemini customer list that he attests was accurate to the best of his knowledge at the time and **will make revisions if**

---

[15] Johnson v. Safeco Ins. Co. of Am., 178 Wn. App. 828, 840, 316 P.3d 1054 (2013).

[16] Veith v. Xterra Wetsuits, LLC, 144 Wn. App. 362, 366, 183 P.3d 334 (2008).

[17] Rorvig v. Douglas, 123 Wn.2d 854, 858, 873 P.2d 492 (1994) (quoting Blue Mountain Constr. Co. v. Grant County Sch. Dist. 150-204, 49 Wn.2d 685, 688, 306 P.2d 209 (1957)).

[18] Sea-Van Invs. Assocs. v. Hamilton, 125 Wn.2d 120, 126, 881 P.2d 1035 (1994).

[19] BLACK'S LAW DICTIONARY 1124 (10th ed. 2014).

*errors are found within 10 days of the wiring of the funds in paragraph [one].*[20]

On October 15, 2015, Markman struck the above emphasized language, initialed the change in the right margin of the document, and signed the agreement. Specifically, the document he returned stated, in relevant part, as follows:

> Markman has previously provided Thomas on May 7, 2015 with a copy of the Gemini customer list that he attests was accurate to the best of his knowledge at the time. ~~and will make revisions if errors are found within 10 days of the wiring of the funds in paragraph [one].~~[21]

He then e-mailed Thomas to point out these changes and attached the signed agreement. The e-mail stated:

> I signed and initialed the doc[ument]s attached.
>
> There was one half-sentence change where you will see there are Xs on the pdf.
>
> I am attesting that the customer list was *accurate to the best of my knowledge at the time it was sent.*
>
> The information came straight out of my database. If there are any errors, the same errors are still in my records.
>
> Furthermore[,] a customer might have changed his . . . information without informing us. I am *not going to commit to tracking those down for you, or doing any further research of any kind.*
> . . . .[22]

---

[20] Clerk's Papers at 35, 167, 175 (emphasis added).

[21] Id.

[22] Id. at 182 (emphasis added).

7

There can be no reasonable dispute that these actions by Markman constituted a rejection of the Thomas offer embodied in the proposed settlement agreement. Likewise, there can be no reasonable dispute that Markman's return e-mail with the attached and modified document constituted a counteroffer that Thomas was free to accept or reject.

That same day, Thomas replied to Markman's counteroffer, in relevant part:

> Are you saying that the email addresses sent are the same email addresses that are being used at present by MCI, and therefore if they contained any errors that would effect a bounce, you would . . . definitely know that by now?
>
> If so, please confirm that back.
> . . . .
>
> *If* you will:
>     1. Confirm back with a reply to this paragraph 1 is correct, and
>     2. Confirm back with a reply back to this you agree only to correct any inadvertent typos that cause an email bounce within 10 days of the wire being sent,
>
> **Then I will also initial the strikeout and send back the document for your records . . . and we are done** except for the wire confirmation.[23]

Similarly to the first exchange between the Markman and Thomas, this e-mail evidences a rejection of the Markman counteroffer. That is because it is not an outright acceptance of that counteroffer. Rather, the response is stated in terms of a counteroffer. That is, "if" Markman would comply with the two stated conditions, then and only then, would Thomas "initial the strikeout and send back

---

[23] Id. at 181 (emphasis added).

the document for [Markman's] records."[24] This, of course, never occurred. There is no contract.

The record shows this in Markman's reply e-mail, which stated:

1 – Yes [that paragraph 1 is correct].
2 -- If there are inadvertent typos in the email addresses, your guess as to what's wrong will be as good as mine so ***there's no point to asking me for help***.[25]

Obviously, this reply does not show acceptance of Thomas's then existing counteroffer. In fact, it is best read as a rejection of that counteroffer. No contract exists.

Thomas replied, in relevant part:

***I have to have someone [verify the email addresses] manually*** . . . . [I]f there are any fails I will ask you to double check the address against your data to see if there was a typo . . . .

***If you agree to that today***, I will do that and we are done.

If you won't even agree to that, ***we have no settlement***. . . . .[26]

This communication shows that verification of the e-mail addresses that were first referenced in paragraph 3 of the proposed settlement agreement was material to Thomas. He says so. Moreover, this exchange further shows that this unsettled term was important enough to Thomas that in the absence of

---

[24] Id.

[25] Id. at 180 (emphasis added).

[26] Id. at 168, 180 (emphasis added).

agreement, there was no settlement: "If you won't even agree to that, *we have no settlement.*"[27]

There is nothing in the record to suggest that Markman accepted this counteroffer at any time. To the contrary, he denies ever doing so. There still is no contract.

Unsettled by the lack of agreement on this material term, Thomas then sent Markman another e-mail stating:

> Confirm with a reply back today you agree to double check against the list you email[ed] from any email addresses from the customer list you sent . . . that may fail a verification test completed in the morning.
>
> I will *then* also initial the strikeout on the mutual release memorializing the revision.
>
> *Barring that, we do not have a settlement* and will proceed accordingly.
> . . . .[28]

Markman did not reply to this e-mail.[29] There still is no contract.

The next day, Thomas sent another e-mail stating:

> The email verification is complete.
> . . . .
> The below addresses got a complete fail and need your cross check to your mailing list upon receipt . . . .
> . . . .
> *Assuming you will do that*, the Settlement Agreement and Mutual Release with the strikeout co-initialed is attached.
>
> The 2 email cross checks and the wire transfer confirmation *will conclude this and there will be no further communication.* If

---

[27] Id. at 180 (emphasis added).

[28] Id. at 168-69, 179 (emphasis added).

[29] Id. at 169.

10

[you] are not going to do the 2 email cross checks as asked please reply that.[30]

Markman did not reply.[31] There is no contract.

Later, Thomas e-mailed Markman again, stating: "We are going to conclude this on this end at 4:30 Eastern Standard Time."[32] Markman did not reply to this e-mail, did not "cross check" the e-mails, and did not validate the customer list.[33] There is no contract.

On October 18, 2015, Thomas sent another e-mail stating:

So there can be no misunderstanding between CDS and MCI before next week:

1. You returned an executed Settlement Agreement and Mutual Release on October 15, 2015 with "and will make revisions if errors are found within 10 days of the wiring of the funds in paragraph 1" struck out and initialed.

2. You were asked to verify 2 email addresses from the Gemini customer list against your mailing list the next morning, Friday October 16, 201[5], at 11:42 ET, or asked to say you would not do it, and after the verification send a wire confirmation of the settlement figure *to conclude the private settlement option*.

3. You neither gave verification, or notice of a good faith attempt to do so, of the 2 email verification requests, nor did you reply you were not going to do it, nor did you send a wire confirmation . . . .

4. On October 14, 2015 you stated you would win this dispute in binding arbitration.

5. If you believe that, agree to it before Tuesday.

---

[30] Id. at 169-70, 186 (emphasis added).

[31] Id. at 170.

[32] Id. at 170, 185.

[33] Id. at 170.

6. Otherwise, double check the 2 email addresses as a courtesy, or state you are not going to do it, and send the wire confirmation . . . .

If you have no response to any of the above Monday by 1:00 pm ET we will assume you will not agree to binding arbitration, *nor are opting for the private settlement option.*[34]

This document evidences that no contract existed as of its date. The emphasized language in the above quotation shows this. Moreover, it further evidences another counteroffer by Thomas to Markman. There is no contract.

The next day, Markman responded: "Let's go to binding arbitration. Let me know what you propose for place and forum."[35] At best, this evidences a willingness to explore arbitration of the disputes between the parties. Given that Thomas raised this option in his October 18, 2015 e-mail, it further illustrates that he did not believe there was a binding contract between the parties. We agree with this assessment.

Thomas replied that day, stating he would contact the American Arbitration Association.[36] Thomas's later e-mail to Markman stated:

[U]pon examining binding arbitration thoroughly, we would not agree to it. . . . *We have an existing executed Settlement Agreement and Mutual Release making arbitration pointless.* I initialed your change and sent it back in good faith, and the electronic transmission of such is binding. You can consent to cross-check the 2 email addresses by your own volition as a courtesy, but that action is not covered under the agreement and release.
. . . .[37]

---

[34] Id. at 170, 191-92 (emphasis added).

[35] Id. at 171, 194.

[36] Id.

[37] Id. at 171-72, 197 (emphasis added).

12

This reply is curious in that it first raises the claim that an enforceable settlement agreement then existed. That conflicts with his prior statement seeking to pursue arbitration. There is no contract.

Markman responded:

> You declared the settlement void at 4:30 pm on Friday afternoon, and then again at 1 pm today.
>
> So there is no settlement as far as I am concerned. You cancelled it. Twice, actually.
> . . . .[38]

To summarize, the record shows that Thomas first proposed the terms of the written settlement agreement when he sent the proposed document to Markman on October 15, 2015. Markman deleted the portion of paragraph 3 dealing with customer lists. He initialed the change and returned the proposed document with his counteroffer to Thomas.

The string of e-mails that follows shows that Thomas never agreed to the counteroffer. In fact, he made several counteroffers of his own. Markman did not accept them. There never was any objective manifestation of mutual assent to the material term regarding customer lists. Thus, there never was a contract.

The trial court improperly concluded that the parties had "entered into a final, complete[,] and signed settlement agreement on October 15, 2015."[39] There was no agreement either as of that date or thereafter.

---

[38] Id.

[39] Id. at 236.

CDS unconvincingly asserts in its briefing that the term regarding customer e-mail addresses was not material to the settlement. But Thomas and Markman's conduct, as evidenced in their exchange of e-mails, demonstrates the materiality of this modification to paragraph 3 of the proposed settlement.

Equally unconvincing is the assertion that Florida law requires that the integration clause in the proposed settlement agreement is "'a highly persuasive statement that the parties intended the agreement to be totally integrated . . . .'"[40] This argument presupposes a contract, and there is none.

CDS further contends that its acceptance of Markman's modification of the settlement agreement "concluded the matter." But Thomas never accepted Markman's counteroffer. Thomas rejected the counteroffer when he responded with counteroffers of his own, which Markman either never accepted or rejected. Thus, this argument is without merit.

Finally, for this first time at oral argument of this case in this court, CDS asserted that there was an abandonment of the term in paragraph 3 of the proposed settlement agreement regarding customer e-mail addresses. We need not consider arguments made for the first time at oral argument.[41] We decline to do so in this case.

---

[40] Brief of Respondent at 12-13 (quoting Envtl. Servs., Inc. v. Carter, 9 So. 3d 1258, 1265 (Fla. Dist. Ct. App. 2009)).

[41] See Anderson v. Dussault, 181 Wn.2d 360, 373, 333 P.3d 395 (2014); RAP 12.1(a).

## MUTUAL RELEASE

Markman argues that the trial court improperly dismissed MCI's claims. We agree.

In addition to the settlement agreement, Markman and Thomas signed a mutual release. The release provided that the parties:

> hereby release, and by signing this document hereby discharge, each other from any and all claims, demands, and causes of action, whether at law or in equity, known or unknown, which either Party has against the other as of the date hereof or arising in the future based upon, arising out of, or related to the Gemini business, ***excepting only claims arising from a breach of the Settlement Agreement executed contemporaneously with this Mutual Release***.[42]

The settlement agreement dated the same date as the mutual release also stated: "This document, ***together with the attached Mutual Release***, is the entire Agreement of the Parties relating to the termination of the Gemini business. All prior negotiations are merged into this Agreement."[43]

Below, MCI asserted a breach of contract counterclaim and a third party claim against CDS, Thomas, and Treadstone for contract breach. It appears the trial court dismissed these claims on the mistaken basis that the settlement and release were both valid. They are not. The plain language of the documents show that the release is only effective if the settlement agreement is valid. Because the settlement agreement is not an enforceable contract, the release is not effective. Accordingly, we vacate the decision dismissing MCI's claims.

---

[42] Clerk's Papers at 37 (emphasis added).

[43] Id. at 36 (emphasis added).

15

## OTHER MATTERS

We need not address whether the trial court abused its discretion by not conducting an evidentiary hearing before granting the motion to enforce the settlement agreement. The argument that the trial court improperly entered the judgment in favor of CDS because it lacked the capacity to commence this suit is also unnecessary to decide. We need not address whether the trial court improperly entered a judgment against Ellen Markman, Markman's wife. Lastly, we also need not address whether the trial court improperly awarded prejudgment interest, costs, and attorney fees to CDS. These issues are now moot.

We reverse the Judgment, the Order Granting Plaintiff's Motion to Enforce Settlement, and the Order Denying the Motion for Reconsideration. Although it is not in the record on appeal, we also vacate the decision dismissing MCI's counterclaim and third party complaint.

_Cox, J._

WE CONCUR: